*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0349p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

KIMBERLY SYKES, TEVYA GRACE URQUHART,
     *Plaintiffs-Appellees/Cross-Appellants,*

     *v.*

DERRICK ANDERSON, CAROL NICHOLS,
     *Defendants-Appellants/Cross-Appellees.*

Nos. 08-2088/2090/
2118

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 05-71199; 05-73725—Nancy G. Edmunds, District Judge.

Argued: April 29, 2010

Decided and Filed: November 9, 2010

Before: MOORE and GILMAN, Circuit Judges; RUSSELL, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Linda D. Fegins, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellants. Mark Granzotto, MARK GRANZOTTO, P.C., Royal Oak, Michigan, for Appellees **ON BRIEF:** Linda D. Fegins, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellants. Mark Granzotto, MARK GRANZOTTO, P.C., Royal Oak, Michigan, Julie H. Hurwitz, GOODMAN & HURWITZ, P.C., Detroit, Michigan, Thomas M. Loeb, LAW OFFICE OF THOMAS M. LOEB, Farmington Hills, Michigan, for Appellees.

_____

[*] The Honorable Thomas B. Russell, Chief United States District Judge for the Western District of Kentucky, sitting by designation.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.   In 2004, the Michigan Court of Appeals overturned Kimberly Sykes's and Tevya Urquhart's convictions for the state crimes of "Larceny by Conversion" and "False Report of a Felony" on the grounds that their convictions were based on mere "speculation" and "layers of impermissible inferences."   After their release from prison, Sykes and Urquhart ("the Plaintiffs") brought 42 U.S.C. § 1983 actions against several Detroit police officers, asserting claims of false imprisonment, malicious prosecution, and denial of due process.  The Plaintiffs also brought suit against the City of Detroit on the grounds that the City failed to respond to citizen complaints and failed to train and supervise its employees.  The district court dismissed the claims against the City of Detroit prior to trial but submitted the remaining claims to the jury.  Ultimately, the jury returned a verdict in favor of the Plaintiffs on three claims against two individual officers ("the Defendants") and awarded the Plaintiffs over $2.5 million in compensatory and punitive damages.  The Defendants now contest the district court's denial of their motion for judgment as a matter of law and appeal the damage award.

For the following reasons, we **AFFIRM** the judgment of the district court as to the Plaintiffs' claims of false arrest, malicious prosecution, and violations of due process; we **REMAND** the case for the sole purpose of having the district court articulate, in the first instance, an explanation for its denial of the Defendants' motion for remittitur; and we **HOLD IN ABEYANCE** the Plaintiffs' cross-appeals in Case Numbers 08-2090 and 08-2118, pending our review of the district court's explanation for the denial of the Defendants' motion for remittitur.

## I. FACTS & PROCEDURE

### A. Background Facts

On March 7, 2002, Sykes, Urquhart, and a third individual, Kimberly Holmes, arrived at their place of employment, a Sprint PCS store, in Detroit, Michigan shortly before 8:00 a.m. in order to open the store for business. As Urquhart disabled the alarm and the three women entered the store, two men approached and forced their way into the store's foyer despite Sykes's and Urquhart's attempt to close and lock the door behind them. Once inside, one of the men told the women to "shut the F up before somebody get[s] shot" and revealed a gun that he had been concealing under his shirt. Dist. Ct. Docket ("Doc.") 256 (Urquhart Trial Test. at 151–52). The two men then marched the women at gun point through the employee door to the back of the store where they were ordered to lie on the floor. Urquhart testified that one of the robbers "proceeded to say [that] one of [them] better get the F up and open up the safe door." Doc. 257 (Urquhart Trial Test. at 21). Urquhart, who was three months pregnant at the time, was the only one who had the combination to open the safe. She was led at gunpoint to the room where the safe was located and was ordered to enter the room and remove the money contained inside the safe. In compliance with the armed robber's demand, Urquhart crossed the small room to the safe, "pulled out a money bag and [] slid it across [the floor] to the man at the door." *Id.* at 23. Retrieving the money bag, the armed man then ordered Urquhart to "shut up and get back on the ground," threatened to "come back and shoot" the women if they tried to do anything, and closed the door as he left. *Id.* at 26. The two robbers fled with approximately $27,000.

Within minutes of the perpetrators' exit, Holmes and Sykes approached the room containing the safe to check on Urquhart. When Urquhart rose from the floor to let Holmes and Sykes into the safe room, she was hysterical and crying uncontrollably. Sykes immediately called the police on her cellular phone. Still fearing that the robbers would return, the women decided to "barricade" themselves "under the table" in the safe room and wait for help. *Id.* at 33. During the ten-minute period that the women waited for the police to arrive, Urquhart remained inconsolable. At one point, she briefly

emerged from under the table, crawling a few feet to a trash receptacle positioned next to the safe where she proceeded to spit up into the trash. Holmes also emerged from under the "safe haven" of the table sometime after Urquhart returned, crawled to the safe, opened the door, took out the remaining money bag, and then returned the money bag to the safe. *Id.* Images of the robbery were captured on the store's surveillance cameras with the exception of several dead spots, i.e., locations that were outside of the cameras' view, which included the hallway where the women initially were forced to lie down and the space underneath the table in the safe room.

When officers from the Detroit Police Department arrived on the scene, Defendant Sergeant Carol Nichols, the officer in charge, and Officer Terrence Sims began taking witness statements. Urquhart became increasingly agitated and extremely emotional when Sgt. Nichols attempted to interview her in the room where the robbery had just occurred and with the door closed. Sgt. Nichols testified that she found Urquhart's agitation suspicious and believed her to be "'full of crap,'" Doc. 260 (Nichols Trial Test. at 45) (quoting Nichols's deposition), although Sgt. Nichols did recognize that the interview took place in the same room where the pregnant Urquhart was held at gunpoint less than two hours earlier. Urquhart ultimately required medical treatment at the scene. Following Sgt. Nichols's conversation with Urquhart, Urquhart signed a written witness statement that Sgt. Nichols had drafted, providing Urquhart's account of the robbery. Both Sykes and Holmes also provided statements to the police at the scene, and, as with Urquhart, Sgt. Nichols found Sykes's statement suspicious, albeit for ever-changing reasons. Sgt. Nichols and Officer Sims also interviewed the store's Assistant Manager, Deshawn Mallory, who confirmed that he had placed two money bags in the safe the previous evening and that only one of them was missing.

During the ensuing police investigation, Sgt. Nichols began to suspect that the robbery was an inside job and that the three women had staged the crime. In addition to finding suspicious both Urquhart's agitation at being interviewed and Sykes's witness statement, Sgt. Nichols also had uncovered that Holmes was a frequent gambler at a local casino, which possibly supplied a motive. On March 11, 2002, Sgt. Nichols

prepared a subpoena to serve on MotorCity Casino ("Casino"). Ten days later, on March 21, 2002, the Casino faxed to Sgt. Nichols's attention at the police station Holmes's gaming records for the three days immediately following the robbery: March 8, March 9, and March 10. Those records indicated that Holmes's "player's card" was used to gamble $23,116 at the Casino over those three days. Importantly, however, the Casino cautioned in a disclaimer letter included with the gaming records that the amount of money wagered with a player's card was not reliable as to (1) the amount of money wagered or (2) the identity of the gambler. The Casino further disclosed that the records were estimates developed for marketing purposes and "would not establish in any reliable manner the dates of attendance, gambling activities, or winnings or losses of a player." Doc. 231-7 (Casino Letter at 2).

Sgt. Nichols never received the Casino records because she had been replaced as the officer in charge by Defendant Sergeant Derrick Anderson. It was thus Sgt. Anderson who retrieved the fax. Despite the disclaimer letter on the front of the records stating explicitly that the gaming records neither confirmed that Holmes had wagered the amount listed nor that Holmes was actually even present at the Casino, Sgt. Anderson conducted no further investigation. As the new officer in charge, Sgt. Anderson and his partner, Police Investigator Maurice McClure, obtained the original VHS video-surveillance tape from the Sprint PCS store and digitized the tape with the help of the Michigan State Police Technical Services Unit so that the images could be viewed in sequence.[1] According to Sgt. Anderson, he viewed the tape numerous times.

Based on the evidence that both he and Sgt. Nichols had gathered, on April 27, 2002, Sgt. Anderson prepared an Investigator's Report and sought authorization for an arrest warrant for Sykes, Urquhart, and Holmes from Assistant Prosecuting Attorney, Rita H. Lewis, at the Wayne County Prosecutor's Office. In addition to his written report detailing his investigation, Sgt. Anderson also submitted to Lewis the digitized

---

[1]The Sprint PCS store's security system is referred to as a "multiplex" time-lapse system. In essence, multiple cameras placed throughout the store take various still photographs within seconds of each other but do not record continuously, as a normal video camera would do. The tape must be "demultiplexed" in order to view a continuous stream of ordered images.

surveillance tape from the Sprint PCS store, all of the witness statements, the Preliminary Complaint Report ("PCR"), and a list of potential witnesses. No one else in the Detroit Police Department reviewed Sgt. Anderson's request prior to its submission to Lewis, thereby allowing to go undetected several flagrant misrepresentations, exaggerations, and omissions of evidence that were key to determining whether probable cause existed to believe that the Plaintiffs had committed any crime. Lewis authorized the issuance of warrants for all three women, charging them with "Larceny by Conversion" and "False Report of a Felony." In her notes on why probable cause existed to arrest and charge the women, Lewis reproduced several of Sgt. Anderson's misrepresentations of the evidence.

Armed with arrest warrants, Sgt. Anderson and Officer McClure arrested Sykes at her home on May 11, 2002. Following Sykes's arrest, Urquhart, now five-months pregnant, turned herself in to the police. A state court conducted a preliminary examination for Urquhart and Sykes on July 19 and July 23, 2002, at which time the state court determined that probable cause existed to bind the Plaintiffs over for trial. Sgt. Nichols was the only officer to testify at the hearing, and her testimony contained at least two false statements that bore upon whether there was sufficient evidence to prosecute. Urquhart and Sykes's case proceeded to trial before a jury on October 7, 2002, during which both Sgt. Nichols and Sgt. Anderson testified on behalf of the State. Because the prosecution's principal theory of the case relied heavily on Holmes's gambling habit, the State called Sgt. Anderson to testify about the gaming records that he had received from the Casino. Troublingly, Sgt. Anderson had failed to turn over the gaming records to the Plaintiffs' defense attorneys. Sgt. Anderson also never revealed—to either the prosecution or the defense—that the gaming records had been accompanied by a disclaimer letter, and in direct conflict with that letter, Sgt. Anderson testified that the records established conclusively that Holmes had gambled approximately the same amount of money taken in the robbery in the three days following the robbery.

A jury ultimately convicted Sykes and Urquhart on both counts. Sykes was sentenced to three months in jail and three years of probation, and she was ordered to pay restitution. *People v. Sykes*, No. 245079, 2004 WL 950129, at *1 (Mich. Ct. App. May 4, 2004). Urquhart was sentenced to five months in jail on each count and three years of probation. *People v. Urquhart*, No. 246001, 2004 WL 950062, at *1 (Mich. Ct. App. May 4, 2004). Both were immediately imprisoned. More than one year *after* the Plaintiffs' convictions, Holmes pleaded nolo contendere, received probation, and was ordered to pay restitution. The Michigan Court of Appeals overturned the Plaintiffs' convictions on appeal. Detailing the meager quantity of evidence, the state appellate court held that the convictions were not supported by anything other than mere "speculation" and "impermissibly layered inferences." *Sykes*, 2004 WL 950129, at *2, *3; *see Urquhart*, 2004 WL 950062, at *2, *3.

**B. District-Court Proceedings**

Following her release from prison, Sykes filed suit in Wayne County Circuit Court in March 2005 against six police officers involved in the investigation of the robbery and the City of Detroit, alleging both state and federal-law violations in connection with her arrest and prosecution. The action was removed to federal court. Urquhart similarly filed suit in federal court in October 2005, and the cases were consolidated. Together, the Plaintiffs alleged violations of the Fourth and Fourteenth Amendments in light of their arrests and subsequent prosecutions, claiming that there was an absence of probable cause. They also argued that they were denied due process during their criminal trial because Sgt. Anderson withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In their claim against the City of Detroit, the Plaintiffs asserted that the City was liable under 42 U.S.C. § 1983 for its failure properly to train, monitor, direct, discipline and supervise its officers, specifically referring to the City's policy of having the same individual write and approve an application for a warrant and its failure to respond adequately to citizen complaints against its police officers.

The Defendants filed their first motion for summary judgment in June 2006, which the district court denied "without prejudice to [the] defendants' right to seek summary judgment after [the] plaintiffs have had an opportunity to conduct full discovery." Doc. 48 (Dist. Ct. Order at 5). In June 2007, the Defendants filed their second motion for summary judgment. The district court denied the motion as untimely and also held that the City's motion failed on the merits because the City could not demonstrate an absence of material fact relative to its municipal-liability claim when it continually refused to comply with discovery orders related thereto. In November 2007, the case was reassigned from Judge Friedman to Judge Edmunds. Following the reassignment, Judge Edmunds *sua sponte* requested that the City of Detroit refile its motion for summary judgment on the municipal-liability issue that Judge Friedman had denied and then granted the City of Detroit's motion for summary judgment as to all the claims against it for failure to train or supervise its police officers and failure to respond to citizen complaints. Extensive motion practice subsequently resulted in the dismissal of several individually named police officers, and the case ultimately proceeded to trial on February 5, 2008, against the following parties on the following claims: (1) Sykes's claim of false arrest against Sgt. Anderson,[2] (2) Sykes's and Urquhart's claims of malicious prosecution against Sgt. Anderson and Sgt. Nichols, and (3) Sykes's and Urquhart's claims of due-process violations against Sgt. Anderson, Sgt. Nichols, and Officer McClure.

Following trial, the jury found Sgt. Anderson liable for false arrest, malicious prosecution, and the violation of the Plaintiffs' due-process rights. The jury found Sgt. Nichols liable for malicious prosecution, but found in favor of Officer McClure. The jury awarded Sykes $1,063,000 in compensatory damages and $250,000 in punitive damages, and Urquhart received a compensatory-damage award of $1,020,000 and $250,000 in punitive damages. On March 20, 2008, the Defendants filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and for remittitur of the jury's verdict, both of which the district court denied. The Defendants

---

[2]Urquhart conceded that her claim for false arrest was time barred.

timely appealed, and each Plaintiff filed a timely conditional cross-appeal challenging the district court's grant of summary judgment in favor of the City of Detroit, as well as several of the district court's evidentiary rulings.[3]

## II.  ANALYSIS

On appeal, the Defendants challenge the district court's denial of their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b).  They specifically allege that the district court erred in rejecting their claims that (1) they were entitled to qualified immunity, (2) insufficient evidence supported the jury's verdict as to the false-imprisonment claim, (3) insufficient evidence supported the jury's verdict as to the malicious-prosecution claims, (4) insufficient evidence supported the jury's verdict as to the claims that the Plaintiffs' due-process rights were violated as a result of a *Brady* violation, (5) they were entitled to a new trial because the jury's verdict was unsupported by the evidence, (6) insufficient evidence supported an award of punitive damages, and (7) they were entitled to remittitur because the damages award was clearly excessive.

### A.  Qualified-Immunity Defense

The Defendants first argue that the district court erred in denying their Rule 50(b) motion on qualified-immunity grounds.  As the Plaintiffs correctly contend, however, the Defendants have waived this claim by failing to raise the matter in their Rule 50(a) motion prior to the district court's submission of the case to the jury.  Federal Rule of Civil Procedure 50(a) allows a party to bring a motion for judgment as a matter of law "at any time before the case is submitted to the jury."  Fed. R. Civ. P. 50(a)(2).  If the district court denies that motion and the case is submitted to the jury, "the movant may file a renewed motion for judgment as a matter of law" within ten days after the entry of judgment on the verdict.  *Id.* 50(b).  It is a "well-established proposition," however, "that a post-trial motion for judgment as a matter of law is not available at anyone's request on an issue not brought before the court prior to submission of the case to the

---

[3]We hold these cross-appeals in abeyance.

jury." *Ford v. County of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 50(b) (providing explicitly that a Rule 50(b) motion is a "renewed" Rule 50(a) motion).

In the instant case, the Defendants moved orally for judgment as a matter of law under Rule 50(a), prior to the case's submission to the jury, asserting only that the evidence was insufficient to prove that the Defendants violated the Plaintiffs' Fourth and Fourteenth Amendment rights. Although the Defendants attempt to argue on appeal that their Rule 50(a) argument necessarily included a claim of qualified immunity because the sufficiency of the evidence is "inextricably intertwined" with qualified immunity, we have rejected such an argument. *See Ford*, 535 F.3d at 493. Instead, in *Ford v. County of Grand Traverse*, this circuit reaffirmed that while Rule 50 is not rigidly applied in all circumstances, a pre-verdict motion and a post-verdict motion must be similar enough to "provid[e] notice to the court and opposing counsel of any deficiencies in the opposing party's case prior to sending it to the jury," thereby fulfilling the stated purpose of the Rule. *Id.* at 492 (internal quotation marks omitted). Here, the Defendants' oral Rule 50(a) motion failed to provided the required notice. The Defendants never mentioned "qualified immunity," and they never referenced "clearly established law" or "objectively unreasonable actions," all of which are terms that might have put the court and the Plaintiffs on notice as to the Defendants' qualified-immunity claim.

To the extent that the instant case is distinguishable from *Ford* because the Defendants did raise their qualified-immunity argument in their first unsuccessful motion for summary judgment, that is a distinction without a difference. "[E]ven if a defendant raises qualified immunity at summary judgment, the issue is waived on appeal if not pressed in a Rule 50(a) motion." *Parker v. Gerrish*, 547 F.3d 1, 12 (1st Cir. 2008); *see also* Fed. R. Civ. P. 50. The Defendants' failure to make a pre-verdict motion for judgment as a matter of law under Rule 50(a) on the grounds of qualified immunity precluded them from making a post-verdict motion under Rule 50(b) on that ground. The qualified-immunity claim is waived.

**B. Standard of Review for Rule 50(b)**

Unlike their claim for qualified immunity, the Defendants have properly preserved their claims that the district court erred in denying their Rule 50(b) motion on the jury's findings of liability for (1) false arrest, (2) malicious prosecution, and (3) violations of due-process related to the suppression of evidence under *Brady v. Maryland*, 373 U.S. 83 (1963).

We review de novo the district court's denial of the Defendants' renewed motion for a judgment as a matter of law. *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007). We "apply[] the same deferential standard as the district court," and may grant the motion "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Id.* (internal quotation marks omitted). We must not, in conducting our review, "reweigh the evidence or assess the credibility of witnesses," *id*, and our review is restricted to the evidence that was admitted at trial. 9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2540 (3d ed. 2008) ("When reviewing a district court's grant or failure to grant judgment as a matter of law, a court of appeals only may consider evidence that was admitted at trial."); *Tschira v. Willingham*, 135 F.3d 1077, 1088 (6th Cir. 1998).

**C. Unlawful-Arrest Claim**

Sgt. Anderson challenges the jury's verdict as to his liability for the unlawful arrest of Sykes by arguing that no reasonable juror could have concluded that probable cause to arrest Sykes was lacking. We disagree. "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005); *see also Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009). Because an arrest based on a facially valid warrant approved by a magistrate provides a complete defense, *Voyticky*, 412 F.3d at 677, Sykes, in order to prevail on a false-arrest claim, was required to prove

by a preponderance of the evidence that in order to procure the warrant, Sgt. Anderson "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood" and "such statements or omissions [we]re material, or necessary, to the finding of probable cause." *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000) (internal quotation marks omitted); *see Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (citing *Wilson* with approval and noting that in the § 1983 context "an officer or investigator cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant" (internal quotation marks and alteration omitted)); *Hinchman v. Moore*, 312 F.3d 198, 205–06 (6th Cir. 2002) ("Falsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional"). If the affidavit contains false statements or material omissions, we set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause. *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)); *Burleigh v. City of Detroit*, 80 F. App'x 454, 458 (6th Cir. 2003) (unpublished opinion) ("This alleged exaggeration of the facts need not detain us, however, if other undisputed facts support the state court's probable cause determination."); *cf. United States v. Campbell*, 878 F.2d 170, 171 (6th Cir. 1989).

"'Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc)). To determine whether Sgt. Anderson had probable cause to arrest Sykes, we consider the totality of the circumstances and whether the "facts and circumstances" of which Sgt. Anderson had knowledge at the moment of the arrest were "sufficient to warrant a prudent person . . . in believing . . . that" the seized individual "ha[d] committed . . . an offense." *Hinchman*, 312 F.3d at 204 (internal quotation marks omitted). "The belief of guilt must be particularized with respect to the person to be . . .

seized." *United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006) (internal quotation marks and alteration omitted).

In the instant case, a reasonable jury could have concluded that the evidence introduced at trial showed that Sgt. Anderson deliberately made false or misleading statements and omitted material information from his warrant application in order to manufacture probable cause. Most strikingly, Sgt. Anderson's warrant request made several assertions as to what the store's surveillance video revealed about the robbery that were plainly misleading, if not entirely false. For example, Sgt. Anderson asserted that although Urquhart "stated that she handed the perpetrator" a money bag from the safe, she did not, in fact, "hand[]" the money bag "to the perpetrator." Doc. 231-16 (Warrant Request at 3). Sgt. Anderson also claimed that "[t]he videotape . . . revealed that Ms. Urquhart never had contact with the perpetrator in the safe room or at any time during the robbery." *Id.* Although those statements are not obviously false, they certainly are misleading: the video shows Urquhart engage in movements indicating that she "slid," as opposed to "handed," the money bag to the perpetrator, which Sgt. Anderson did not acknowledge in his investigation materials; moreover, despite the fact that the perpetrator never made physical "contact" with Urquhart, the video clearly shows him standing in the doorway while Urquhart was forced to remove the money bag.

In addition to these misleading statements, some of Sgt. Anderson's claims were simply false. For instance, although the warrant request stated that "Holmes was . . . observed to remove [one] large money bag from the safe and toss it under the table where [the] defendant's [sic] Urquhart and Sykes were hiding" and that "Urquhart was also observed to exit from under the table and place an item (possibly the money bag) into the trashcan," the video shows no such thing. *Id.* First, the video does not show Holmes tossing anything under the table, let alone a bag of money, and, second, Sgt. Anderson inexplicably misrepresented the chronological order of the video by stating that Urquhart emerged from under the table to put something in the trash can after Holmes had removed the money bag from the safe. In fact, however, the video time

stamps indicate that Urquhart emerged from under the table and crawled to the trash can well before Holmes opened the safe.

In addition to making these material misstatements, Sgt. Anderson inexplicably omitted perhaps the most probative evidence as to whether a robbery occurred—the presence of the two armed men. His notes make no mention of the fact that the videotape surveillance shows two men entering the store, thus corroborating Urquhart's and Sykes's statements and account of the robbery. Instead, Sgt. Anderson stated that the investigation revealed that "no robbery took place," and that "the defendant's [sic] met in the parking lot . . . [to conspire] to commit larceny" prior to work and then met "under a table in the safe room" to "divide[] the funds taken from the safe . . . by defendant Holmes." *Id.* But these conclusions are simply not supported by any of the information available to Sgt. Anderson at the time he submitted his warrant application. Confronted with this evidence, a reasonable jury could have concluded that Sgt. Anderson deliberately made numerous misleading, if not patently false, statements and omitted key information from the warrant application establishing that there really was a robbery.

Disregarding Sgt. Anderson's false and misleading statements and considering his material omissions, the evidence plainly supports the jury's finding that probable cause was lacking. At the time Sgt. Anderson submitted his investigatory report and warrant request to Assistant Prosecuting Attorney, Rita H. Lewis, at the Wayne County Prosecutor's Office, his investigation merely revealed the following: On the morning of the robbery, two men entered the Sprint PCS store behind Sykes, Urquhart, and Holmes and forced them toward the back. Although the robbers never fully entered the room with the safe, one of them stood in the doorway and had Urquhart open the safe and slide a money bag to him, and then ordered Urquhart to the ground. Following the robbery, Sykes called the police on her cellular phone, and the Plaintiffs sat under a table in the safe room, which was out of the camera's view, to wait for police. Holmes opened the safe at some point, and removed a money bag. The video does not readily show what she did with the money bag, but witness statements taken at the scene revealed that only

one of the two money bags originally in the safe was missing, which necessitates the conclusion that Holmes replaced the money bag that she briefly handled following the robbery and could not have thrown it under the table. Sgt. Anderson also had discovered that Holmes liked to gamble, and that her player's card had been used in the days following the robbery to wager an amount that approximated the amount stolen. But he also knew that the fact that Holmes's player's card had been used was not evidence that Holmes, in fact, used it, or that the dollar amounts were accurate.

This evidence simply cannot support a finding of probable cause to believe that Sykes was involved in the robbery. Her behavior was entirely consistent with being the victim of a robbery and not incriminating in the least.[4] As the Michigan Court of Appeals aptly concluded, there is simply no particularized evidence connecting Sykes to the robbery other than Sykes's mere presence at the scene of the crime, *see Sykes*, 2004 WL 950129, at \*2, and mere presence is not sufficient to meet the probable-cause threshold. *Harris v. Bornhorst*, 513 F.3d 503, 515 (6th Cir.), *cert. denied*, 128 S. Ct. 2938 (2008) ("[I]t is well-established that an individual's mere presence at a crime scene does not constitute probable cause for an arrest."). Even if Sgt. Anderson was ultimately correct in his conclusion that the robbery was an inside job, there was absolutely no evidence indicating that Sykes herself had knowledge of the plan or otherwise committed a crime at the time he sought his warrant. "Speculation does not equate probable cause," *United States v. McClain*, 444 F.3d 556, 563 (6th Cir. 2005), and "no reasonabl[y] competent officer" would have concluded on these facts that probable cause existed. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In short, we affirm the judgment of the district court as to Sykes's claim of false arrest because probable cause was lacking at the time Sgt. Anderson submitted a warrant

---

[4]Although "a subjective belief by the arresting officer cannot destroy probable cause where it exists," *United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006) (internal quotation marks omitted), it is telling that the investigating officers admitted that they had nothing more than "inarticulable hunches" that the store employees were involved in the robbery. Doc. 260 (Nicohols Trial Test. at 60); *see also* Doc. 261 (McClure Trial Test. at 85) (indicating that the officers' "conclusions [we]re just based on opinion, hunch, whatever you want to call it and that's what was presented to the prosecutor's office"); Doc. 237 (Anderson Trial Test. at 14–15) ("[It was] just my belief.").

application for Sykes, and Sgt. Anderson cannot rely on the warrant's facial validity because it contains his deliberate material misrepresentations and omissions.

**D.  Malicious-Prosecution Claim**

Sgt. Anderson and Sgt. Nichols next appeal their liability for malicious prosecution on two bases:  (1) no reasonable jury could have concluded that they lacked probable cause to arrest the Plaintiffs, and (2) because Sgt. Anderson and Sgt. Nichols did not make the decision to prosecute, the Plaintiffs' claims fail for lack of causation.

**1.  Elements of a Malicious-Prosecution Claim**

The Sixth Circuit "recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment," which "encompasses wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006) (internal quotation marks omitted).  The "tort of malicious prosecution" is "entirely distinct" from that of false arrest, as the malicious-prosecution tort "remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process."  *Wallace v. Kato*, 549 U.S. 384, 390 (2007) (internal quotation marks omitted).  Neither the Supreme Court nor the Sixth Circuit has yet articulated the elements of a Fourth Amendment malicious-prosecution claim under 42 U.S.C. § 1983 with any specificity, *Wallace*, 549 U.S. at 390 n.2; *Briner v. City of Ontario*, 370 F. App'x 682, 701 (6th Cir. 2010) (unpublished opinion), but because exploration of the showing required under federal law is necessary to resolve the instant case, we do so now.

To succeed on a malicious-prosecution claim under § 1983 when the claim is premised on a violation of the Fourth Amendment, a plaintiff must prove the following: First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant "ma[d]e, influence[d], or participate[d] in the decision

to prosecute."**5** *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007); *see also McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005); *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001); *Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002). Second, because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution, *Fox*, 489 F.3d at 237; *Voyticky*, 412 F.3d at 675. Third, the plaintiff must show that, "as a consequence of a legal proceeding," the plaintiff suffered a "deprivation of liberty," as understood in our Fourth Amendment jurisprudence, apart from the initial seizure. *Johnson v. Knorr*, 477 F.3d 75, 81 (3d Cir. 2007); *see Gregory v. City of Louisville*, 444 F.3d 725, 748–50 (6th Cir. 2006) (discussing the scope of "Fourth Amendment protections . . . beyond an initial seizure," including "continued detention without probable cause"); *cf. Heck v. Humphrey*, 512 U.S. 477, 484 (1994) ("[U]nlike the related cause of action for false arrest or imprisonment, [an action for malicious prosecution] permits damages for confinement imposed pursuant to legal process."). Fourth, the criminal proceeding must have been resolved in the plaintiff's favor. *Heck*, 512 U.S. at 484 ("One element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused.").

This circuit has never required that a plaintiff demonstrate "malice" in order to prevail on a Fourth Amendment claim for malicious prosecution, and we join the Fourth Circuit in declining to impose that requirement. *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 184 n.5 (4th Cir. 1996). The circuits that require malice have imported elements from the common law without reflecting on their consistency with the overriding *constitutional* nature of § 1983 claims. *See Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (requiring a Fourth Amendment violation plus each element of the applicable state's law); *McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009) (requiring malice); *Lassiter v. City of Bremerton*, 556 F.3d 1049,

---

**5**The meaning of the term "participated" should be construed within the context of tort causation principles. Its meaning is akin to "aided." To be liable for "participating" in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating.

1054 (9th Cir. 2009) (same); *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008) (same); *Grider v. City of Auburn*, 618 F.3d 1240, 1256 & n.24 (11th Cir. 2010) (same). Common-law and § 1983 claims have different foundations. As the Supreme Court explained in *Albright v. Oliver*, "the constitutional tort 42 U.S.C. § 1983 authorizes stands on its own, influenced by the substance, but not tied to the formal categories and procedures, of the common law." 510 U.S. 266, 277 n.1 (1994) (Ginsburg, J., concurring); *see also Carey v. Piphus*, 435 U.S. 247, 258 (1978) (requiring courts to "adapt[] common-law rules of damage" when adjudicating § 1983 cases because "the interests protected by a particular constitutional right may not also be protected by an analogous branch of the common law torts"); *Pierce v. Gilchrist*, 359 F.3d 1279, 1285–90 (10th Cir. 2004) (McConnell, J.) ("rejecting the view that a plaintiff does not state a claim actionable under § 1983 unless he satisfies the requirements of an analogous common law tort"). This court recognized the difference in *Frantz v. Village of Bradford*, in which we "h[e]ld that *Albright* precludes reliance on state law to define a § 1983 federal cause of action" and "reject[ed] the reasoning of courts which have relied on the state law elements of malicious prosecution." 245 F.3d 869, 874–75 (6th Cir. 2001), *abrogated as recognized by Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003); *see also Darrah*, 255 F.3d at 311–12 (confirming that this language in *Frantz* survived abrogation).

In the context of malicious prosecution, the Fourth Amendment violation that generates a § 1983 cause of action obviates the need for demonstrating malice. "For instance, if the harm alleged is a seizure lacking probable cause, it is unclear why a plaintiff would have to show that the police acted with malice." *Gallo v. City of Philadelphia*, 161 F.3d 217, 222 n.6 (3d Cir. 1998). In fact, Fourth Amendment jurisprudence makes clear that we should not delve into the defendants' intent. "[T]he reasonableness of a seizure under the Fourth Amendment should be analyzed from an objective perspective," which, even in the context of malicious-prosecution claims,

renders "irrelevant" "the subjective state of mind of the defendant, whether good faith or ill will." *Brooks*, 85 F.3d at 184 n.5.[6]

We recognize that "designating the constitutional claim as one for 'malicious prosecution' is both unfortunate and confusing. A better name that would perhaps grasp the essence of this cause of action under applicable Fourth Amendment principles might be 'unreasonable prosecutorial seizure.'" *Frantz*, 245 F.3d at 881 (Gilman, J., dissenting on other grounds to a holding that was abrogated by *Darrah*, 255 F.3d at 311–12). Still, we are "stuck with that label," *id.*, and we conclude that malice is not an element of a § 1983 suit for malicious prosecution.[7]

For the reasons explained below, we conclude that a reasonable jury could have found the Defendants liable for malicious prosecution. In the instant case, there was not only a lack of probable cause to institute a criminal proceeding against the Plaintiffs, but the Defendants' actions in this case were sufficient to qualify as either "influence [over] or participat[ion] in the decision to prosecute" regardless of the fact that the Defendants, themselves, did not make the ultimate decision. *Fox*, 489 F.3d at 237.

---

[6]*Pierce*, which expressed no opinion on whether malice is an element, suggested in a footnote that malicious-prosecution liability for falsifying or omitting evidence might attach only if an officer acts "knowingly and intelligently, or with reckless disregard for the truth." 359 F.3d at 1297 n.12 (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). *Franks* applies only when a criminal defendant challenges a warrant affidavit. 438 U.S. at 164–65. Its logic cannot justify a freestanding malice element for all malicious-prosecution claims against all defendants. Moreover, in the context to which *Franks* does apply, a malice-type element would be superfluous. *Franks* is relevant to malicious prosecution only to determine whether, in the absence of a bad-faith misrepresentation, *probable cause* still would have existed. When an officer is sued for malicious prosecution stemming from false but good-faith statements in a warrant affidavit, the officer will prevail even without a malice element because of *Franks*. Thus, *Franks* does not provide a reason to depart from the general Fourth Amendment principle that motive is irrelevant.

[7]In this case, the jury was instructed that the Plaintiffs were required to prove that: (1) "a criminal proceeding was commenced against Plaintiffs," (2) the "Defendants commenced or continued the criminal proceeding against Plaintiffs," (3) "the criminal proceeding ended in favor of Plaintiffs," (4) "the criminal proceeding was commenced or continued by Defendants without probable cause," (5) the "Defendants acted *with malice*," and (6) the "Plaintiffs were damaged by the criminal proceeding." Doc. 186-5 (Jury Instructions at 10); Doc. 265 (Oral Jury Instructions at 35). The jury instructions thus improperly required a showing of malice, but that error is harmless because the jury found in favor of the Plaintiffs on their claim of malicious prosecution despite the erroneously stringent standard.

### 2. No Probable Cause to Initiate Criminal Proceedings[8]

The Defendants first claim that they had probable cause to arrest the Plaintiffs, and they argue that this fact necessarily defeats the instant malicious-prosecution claim. In order to distinguish appropriately this claim from one of false arrest, we must consider not only whether the Defendants had probable cause to arrest the Plaintiffs but also whether probable cause existed to initiate the criminal proceeding against the Plaintiffs. *See, e.g.*, *Fox*, 489 F.3d at 237 ("What is certain . . . is that [a malicious prosecution] claim fails when there was probable cause *to prosecute . . .*" (emphasis added)); *Barnes*, 449 F.3d at 716 ("[T]he defendants had probable cause *to seek an indictment* against [the plaintiff]." (emphasis added)).

We have already concluded that the Defendants lacked probable cause to arrest Sykes, and the Defendants have pointed to no evidence uncovered subsequent to Sykes's arrest that would call into question the jury's belief that there was no probable cause to initiate criminal proceedings against her. Turning to Urquhart, we similarly conclude that probable cause to arrest and prosecute was lacking. As outlined above, apart from inviting pure speculation as to the Plaintiffs' potential involvement, the facts revealed by the surveillance video from the Sprint PCS store provided no reasonable ground for the belief that Urquhart was a perpetrator of the robbery, as opposed to its victim. To the extent that the Defendants assert that Urquhart's behavior at the time Sgt. Nichols interviewed her provides support for a finding of probable cause, we wholly disagree. It bears repeating that at the time that Sgt. Nichols asked Urquhart to provide a statement, only two hours had passed since the robbery. Urquhart was visibly shaken and required medical treatment. Moreover, Urquhart was pregnant at the time of the robbery and had been the victim of a home invasion just days earlier, and Sgt. Nichols was aware of these facts. A reasonable jury could have found that any one of these factors explained and justified Urquhart's amplified agitation and displeasure with

---

[8]Because the Plaintiffs' malicious-prosecution claim "is based on a police officer's supplying false information to establish probable cause," the determination of probable cause that the state court made at the Plaintiffs' preliminary hearing does not carry preclusive effect in the instant case. *Peet*, 502 F.3d at 566 (citing *Hinchman*, 312 F.3d at 202–03).

having to remain at the scene to speak with police.  Mere disinterest in speaking with an officer under the circumstances here is not sufficient to meet the probable-cause threshold.  Furthermore, as with Sykes, the Defendants have failed to point to any untainted and truthful post-arrest evidence bearing upon whether there was probable cause to institute a criminal proceeding against Urquhart.

Contrary to the Defendants' claim, viewing the totality of the circumstances at the time of the Plaintiffs' arrest and through the time that the criminal proceeding against them commenced, a reasonable jury could have concluded that there was no probable cause to believe that either Sykes or Urquhart had committed any crime.

### 3.  Defendants Influenced Decision to Prosecution

The Defendants further claim that they cannot be held liable for malicious prosecution because they did not *make* the decision to prosecute the Plaintiffs.  There is very little case law in this circuit discussing precisely what role an investigating officer must play in initiating a prosecution such that liability for malicious prosecution is warranted, but existing cases do indicate that an officer may be responsible for commencing a criminal proceedings against a plaintiff, where the officer "ma[d]e, influence[d], or participate[d] in the decision to prosecute." *Fox*, 489 F.3d at 237.  Thus, contrary to the Defendants' assertion, the fact that they did not *make* the decision to prosecute does not per se absolve them from liability.  Instead, the Plaintiffs were entitled to prove that the Defendants either "influence[d ] or participate[d] in the decision to prosecute." *Id.*[9]  Because Sgt. Nichols and Sgt. Anderson played distinct roles in the process, we analyze their actions separately in order to determine whether the Plaintiffs have met their burden with respect to this element.

---

[9]Whether an officer influenced or participated in the decision to prosecute hinges on the degree of the officer's involvement and the nature of the officer's actions. *See Malley v. Briggs*, 475 U.S. 335, 344–45 n.7 (1986) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)) (construing § 1983 "against the background of tort liability," in which people are responsible for "natural consequences" of their acts). The totality of the circumstances informs this fact determination.

***Sgt. Nichols's Testimony at the Plaintiffs' Preliminary Hearing***. The Plaintiffs' claim of malicious prosecution against Sgt. Nichols is predicated on two misrepresentations that she made during her sworn testimony at the preliminary hearing where the decision was made to bind the Plaintiffs over for trial. It is well established in this circuit that "[p]olice officers cannot, in good faith, rely on a judicial determination of probable cause [to absolve them of liability] when that determination was premised on an officer's own material misrepresentations to the court." *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006). This means that in order to establish that a testifying officer was responsible for commencing a criminal proceeding for purposes of a malicious-prosecution claim, the Plaintiffs were required to present evidence that Nichols "(1) stated a deliberate falsehood or showed reckless disregard for the truth [at the hearing] and (2) that the allegedly false or omitted information was material to the [court's] finding of probable cause." *Id.*; *see Molnar v. Care House*, 359 F. App'x 623, 627 (6th Cir. 2009) (unpublished opinion) ("Even accepting [the] allegation that [the officer] 'knowingly supplied the magistrate with false information,' *Darrah*, 255 F.3d at 311, the state court did not rely on her testimony *to establish probable cause*.").

Based on the evidence in the instant case, a reasonable jury could have concluded that Sgt. Nichols testified falsely at the preliminary hearing and that her statements were material to the state court's finding of probable cause. First, the evidence before the jury revealed that Sgt. Nichols—the only officer called to testify at the preliminary hearing—testified that the video-surveillance evidence contradicted Urquhart's witness statement and account of the robbery when, in fact, Urquhart's statement was entirely consistent with that evidence.[10] A reasonable jury could have found not only that Sgt. Nichols's statement amounted to false testimony but also that it was material to the state

---

[10]Specifically, Sgt. Nichols testified at the preliminary hearing that Urquhart told her that the "'gunman took her into the room where the safe was, and then held her at gunpoint and told her to open the safe and give him the money.'" Doc. 288 (Nichols Trial Test. at 84) (quoting testimony from preliminary hearing). Sgt. Nichols then claimed that Urquhart's statement was not supported by the video evidence because at no point did the gunman go into the safe room with Urquhart. On cross-examination in the instant case, however, Sgt. Nichols admitted that "[t]here [wa]s nothing in [Urquhart's] witness statement that even suggest[ed] that [the perpetrator] accompanied her into the safe room at gunpoint." *Id.* at 89. Sgt. Nichols further admitted that by testifying that Urquhart's statements were not supported by the evidence, she had "not recall[ed] correctly" at the preliminary hearing notwithstanding the fact that she held Urquhart's witness statement in her hand while testifying at the preliminary hearing. *Id.*

court's determination that there was probable cause to bind the Plaintiffs over for trial. Had Sgt. Nichols testified that Urquhart's account of the robbery was entirely consistent with the video evidence, Sgt. Nichols's truthful statement might have resulted in a conclusion that there was insufficient evidence to bind the Plaintiffs over for trial. *Cf. United States v. Wallace*, 597 F.3d 794, 801 (6th Cir. 2010) (noting in the context of a perjury charge that "a false declaration satisfies the materiality requirement if a truthful statement might have assisted or influenced . . . the [court] in its investigation." (internal quotation marks and alteration omitted)). Consistency between an alleged perpetrator's statement and the remaining evidence in a case is certainly relevant to determining not only whether the alleged perpetrator was involved in criminal activity but also the credibility of the alleged perpetrator's repeated exclamations of innocence. *Cf. United States v. Rose*, 889 F.2d 1490, 1493 (6th Cir. 1989) (indicating that a police officer's discovery of "evidence contradicting the [alleged perpetrator's] previous statements" could "elevat[e] the agent's suspicion to probable cause"). In fact, the materiality of Sgt. Nichols's false testimony in determining whether there was probable cause to prosecute is highlighted by the prosecutor's reliance on the alleged discrepancy between Urquhart's statement and the video evidence when the prosecutor argued at the preliminary hearing that probable cause existed to believe that the Plaintiffs were involved in the robbery: "'Not only does [Urquhart] say in [her] statement that she handed the bag to this alleged armed robber, her statement makes it sound like there's an armed robber in the room with her.'" Doc. 288 (Nichols Trial Test. at 90–91) (quoting prosecutor's closing argument at the preliminary hearing).

The second falsehood that the Plaintiffs highlight is Sgt. Nichols's testimony at the preliminary hearing that Sykes's and Urquhart's witness statements were suspicious because they were too similar. As the Plaintiffs revealed to the jury in the instant case, however, Sgt. Nichols later testified that Sykes's and Urquhart's witness statements were actually not similar, but were suspicious because they were so different.[11] Again, a

---

[11]In the instant case, Sgt. Nichols testified in response to the Plaintiffs' questions about her testimony at the preliminary hearing as follows:

Q: Do you remember being asked at the preliminary exam what evidence you had to
support your suspicion that Ms. Sykes and Ms. Urquhart were guilty of this crime?

reasonable jury could have concluded that Sgt. Nichols's statements amounted to false testimony. Given that she was the only officer to testify at the preliminary hearing, a reasonable jury likewise could have found that Sgt. Nichols's misrepresentations of the facts regarding not only the evidence in the case but also the credibility of the suspects were material to the state court's decision to bind the Plaintiffs over for trial. As a result, we have no trouble concluding that a reasonable jury could have found that Sgt. Nichols influenced or participated in the decision to prosecute and that her false testimony was thus one cause of the commencement of the criminal proceedings against the Plaintiffs.[12]

*Sgt. Anderson's Investigatory Materials.* Turning to Sgt. Anderson, the Plaintiffs predicate his liability on his affirmative misrepresentations and omissions in his arrest-warrant application and investigative report. This circuit has had few opportunities to address the nexus between an officer's statements in his or her

---

. . .
A:  . . . [Y]es, I do.
Q:  Do you remember the reason that you gave was because their statements were the same?
A:  I remember saying that, yes.
Q:  And that was basically the only reason, wasn't it, for your suspicion of Ms. Sykes?
A:  Their statements were the same.
Q:  So if I understand—let me back up. You testified at the criminal trial as well, didn't you?
A:  I did.
Q:  You were asked that same question, weren't you?
A:  I was.
Q:  You gave the exact opposite answer, didn't you?
A:  I said there were some discrepancies.
Doc. 260 (Nichols Trial Test. at 94–95).

[12] The Defendants argued in their briefs and at oral argument that no reasonable jury could have concluded that Sgt. Nichols's statements were material to a finding of probable cause because "[w]hile under cross examination by the defense" at the preliminary hearing, Sgt. Nichols conceded that she had made misleading or false statements. Appellant Br. at 50. Given that "[t]he judge was aware of the purported alleged discrepancy of [Sgt. Nichols's] testimony," the Defendants claim that it would be incongruous to conclude that the state court then relied on those falsehoods to bind the Plaintiffs over for trial. Appellant Br. at 51.

Although we are sympathetic to Sgt. Nichols's assertion on appeal, we remind the Defendants that our task on review is to consider whether the evidence *before the jury at the time of trial* is sufficient to sustain its verdict. *See, e.g.*, *Tschira*, 135 F.3d at 1088 ("Based on the evidence *presented at trial*, the district court did not commit error in denying Appellants' Rule 50(b) motion." (emphasis added)). Despite the fact that Sgt. Nichols attached to her Rule 50(b) motion excerpts from her preliminary-hearing testimony that indicated that the state court was aware of her false testimony, our review of the trial transcripts indicates that the preliminary-hearing transcript was never submitted to the jury in the instant case. Counsel's failure to submit this very relevant, indeed dispositive, evidence to the jury is questionable, at best. But because we review whether sufficient evidence supported the jury's verdict by looking at the evidence that the jury actually had before it, we must disregard the excerpts from Sgt. Nichols's preliminary-hearing testimony that were not presented to the jury.

investigatory materials and the institution of a criminal prosecution sufficient to sustain a claim for malicious prosecution. It is absolutely clear, however, that an officer will not be deemed to have commenced a criminal proceeding against a person when the claim is predicated on the mere fact that the officer turned over to the prosecution the officer's *truthful* materials. *McKinley*, 404 F.3d at 444; *Skousen*, 305 F.3d at 529; *Wysong v. City of Heath*, 377 F. App'x 466, 470 (6th Cir. 2010) (unpublished opinion); *Kinkus v. Village of Yorkville, Ohio*, 289 F. App'x 86, 91 (6th Cir. 2008) (unpublished opinion) (holding that the officer played no role in the prosecution because the "police report [provided to the prosecutor] did not contain false information").

As discussed above in the context of Sykes's false-arrest claim, however, Sgt. Anderson's liability is not premised on his disclosure of *truthful* investigatory materials. The matter that we must resolve, then, is whether Sgt. Anderson's falsehoods, misrepresentations, and omissions, which clearly led to the Plaintiffs' arrests, can survive a number of intervening decisions by others such that Sgt. Anderson can still be said to have influenced or participated in the decision to institute criminal proceedings. Considering causation broadly, as the Plaintiffs urge, it certainly was Sgt. Anderson's arrest that started the chain of events that ultimately led to the prosecutor's decision to proceed with the criminal charges against the Plaintiffs.[13] Looking at causation more narrowly, Sgt. Anderson reasonably could have foreseen that by providing false information to the prosecutor that bore directly on whether there was probable cause to believe that the Plaintiffs committed a crime, his misconduct could result in not only the Plaintiffs' initial seizure but also their eventual incarceration. And holding Sgt. Anderson liable for all reasonably foreseeable consequences of his initial misdeeds finds support in the Supreme Court's decision in *Malley v. Briggs*, 475 U.S. 335 (1986). In *Malley*, the Supreme Court made clear that normal causation principles apply to 42 U.S.C. § 1983 actions by stating that if an "officer caused [a] plaintiff[] to be unconstitutionally arrested by presenting a judge with a complaint and a supporting

---

[13]As we have noted elsewhere, under "Michigan law . . . a criminal prosecution 'is initiated in the sole discretion of the prosecutor.'" *Moldowan v. City of Warren*, 578 F.3d 351, 400 (6th Cir. 2009) (quoting *Matthews v. Blue Cross & Blue Shield*, 572 N.W.2d 603, 610 (Mich. 1998)).

affidavit [that] failed to establish probable cause," *id.* at 337, it is "clear" that the argument that "the officer should not be liable because the judge's decision to issue the warrant breaks the causal chain between the application for the warrant and the improvident arrest" would be "inconsistent with [its] interpretation of § 1983," *id.* at 344 n.7. But in the instant case, Sgt. Anderson's actions were even more removed from the ultimate relevant decision than those of the officer in *Malley*, and the Plaintiffs' reliance on this case is not entirely convincing. Here, Sgt. Anderson submitted the warrant application and investigatory materials containing false and misleading information to prosecutor, the prosecutor approved the warrant application, a magistrate issued the warrant, and the Plaintiffs were arrested. *See* Mich. Comp. Laws § 764.1(1) (West 2010); *Walczak v. City of Detroit*, 875 F.2d 869 (table) (6th Cir. 1989) (describing the warrant-request process in Michigan). Following the Plaintiffs' arrest, however, there was a preliminary hearing during which the state court made a determination that probable cause to prosecute existed based, in part, on Sgt. Nichols's false testimony, and it is undisputed that Sgt. Anderson did not testify at the preliminary hearing. Although this circuit has not confronted a case entirely analogous to the instant one, *Gregory* is again helpful in determining whether Sgt. Anderson's actions survive these intervening decisions such that he can be said to have influenced or participated in the decision to institute criminal proceedings against the Plaintiffs.

In *Gregory*, this court upheld a district court's grant of summary judgment on a claim of malicious prosecution in favor of two officer-defendants who had fabricated investigative notes indicating that the plaintiff possessed independent knowledge of facts from the crime that only the perpetrator would know. *Gregory*, 444 F.3d at 757. The panel reasoned that the plaintiff had "failed to establish a *Fourth Amendment* injury from the notes' existence and creation" because the plaintiff had presented "no evidence that the notes were presented to the court at the preliminary hearing"—thereby "contribut[ing] to the Court's determination of probable cause to hold Plaintiff over for trial"—or "that the notes influenced any decision to proceed to trial." *Id.* at 759–60. The conclusion not only that the consequences of the officer's actions must be reasonably foreseeable but also that the officer's action must have influenced the

continued detention is consistent with other circuits that have confronted cases similar to the instant one.  For example, in *Reed v. City of Chicago*, the Seventh Circuit noted that although "[i]t is conceivable that a wrongful arrest could be the first step towards a malicious prosecution[,] . . . the chain of causation" will be "broken by an indictment[] absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutor." *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996) (citing *Senra v. Cunningham*, 9 F.3d 168, 174 (1st Cir. 1993), which held that a "[t]he chain of causation [will be] broken if the filing of the information by the attorney at the state Attorney General's office was free of pressure or influence exerted by the police officers or knowing misstatements made by the officers to the Attorney General's office"); *Taylor v. Meacham*, 82 F.3d 1556, 1563–64 (10th Cir. 1996) (adopting *Reed*'s reasoning and holding that no claim could be sustained against a sheriff who may have "set in motion a malicious prosecution" because the "preliminary hearing broke the 'chain of causation'" and there was no evidence that the sheriff "made false or misleading statements following [the plaintiff's] arrest, nor that he somehow caused false or perjured testimony to be presented at the preliminary hearing").  Likewise, in *Higazy v. Templeton*, the Second Circuit concluded that "[d]efendants . . . may be liable for consequences caused by reasonably foreseeable intervening forces," and "the chain of causation need not be considered broken [in a malicious-prosecution claim against an officer] if [the officer] deceived the subsequent decision maker or could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty." *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007) (internal quotation marks, citation, and alteration omitted).

Based on the foregoing caselaw, we conclude that in order to show that Sgt. Anderson participated in or that his actions influenced the commencement of criminal proceedings as required to sustain a claim of malicious prosecution, the Plaintiffs were required to present some evidence that the impact of Sgt. Anderson's misstatements and falsehoods in his investigatory materials extended beyond the Plaintiffs' initial arrest and ultimately influenced the Plaintiffs' continued detention.  We also conclude, however, that such influence is not narrowly limited to the introduction of Sgt. Anderson's false

statements as evidence at the preliminary hearing but can also be based on Sgt. Anderson's "knowing misstatements . . . to the prosecutor" or his "pressure or influence," *Reed*, 77 F.3d at 1053, over an individual who either made the decision to prosecute or testified at the preliminary hearing.

Employing this standard in the instant case, a reasonable jury could have found that Sgt. Anderson participated in or influenced the decision to prosecute the Plaintiffs such that liability for malicious prosecution is proper. Perhaps the most telling evidence of Sgt. Anderson's influence over the decision to commence criminal proceedings against the Plaintiffs resides in his investigatory materials, which were clearly in the prosecution's possession. Not only did these materials contain knowing misstatements, as outlined previously, but also it is apparent from the record that the prosecution actually relied on many of Sgt. Anderson's falsehoods in proceeding against the Plaintiffs by reproducing many of the very same material misrepresentations of the evidence that Sgt. Anderson had made. For example, Lewis stated in her notes that the surveillance "video tape does not show an [armed robbery]" because "nothing [was] taken from the safe until the [defendants were] alone in the room," and that the Plaintiffs "appear[ed] to be counting money." Doc. 231-17 (Prosecutor Notes). This is plainly not the case, and a reasonable jury could have concluded from the striking similarities between Prosecutor Lewis's unsupported conclusions and Sgt. Anderson's falsehoods that the prosecution relied on Sgt. Anderson's misstatements in filing criminal charges. Sgt. Anderson's influence can likewise be seen in the prosecution's reference to the Holmes gaming records. Notwithstanding the fact that the prosecution had not seen any documentation from the Casino, Lewis noted that Holmes had "spent almost the exact amount stolen [at] a casino" and that Sgt. Anderson, the officer in charge, "ha[d] the records" to prove it. *Id.*

In short, the fact that Sgt. Anderson did not *make* the decision to initiate the criminal proceedings against the Plaintiffs is of no moment, as the record contains ample evidence that Sgt. Anderson influenced or participated in the ultimate decision to prosecute the Plaintiffs by way of his knowing misstatements to the prosecutor. As the

Seventh Circuit stated in *Jones v. City of Chicago*, "[i]f police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him." *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988). "They cannot hide behind the officials whom they have defrauded." *Id.* We thus affirm the judgment against the Defendants as to the Plaintiffs' claims for malicious prosecution.[14]

### E. Due-Process Claim

Sgt. Anderson also challenges on appeal the jury's conclusion that his failure to disclose the letter from MotorCity Casino casting doubt on the reliability of Holmes's gaming records violated the Plaintiffs' right to a fair criminal trial in violation of due process. Specifically, Sgt. Anderson claims that there was insufficient evidence for the jury to determine that he concealed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), because: (1) a *Brady* claim cannot be raised against a police officer in a § 1983 action, (2) *Brady* is inapplicable where the evidence is available from another source, (3) the evidence was not favorable to the Plaintiffs, and (4) the Plaintiffs are unable to show prejudice. We address and reject each of Sgt. Anderson's assertions in turn.

As discussed previously, the contested evidence consisted of a three-page letter from the MotorCity Casino that was sent as part of the Casino's longer, nine-page response to Sgt. Nichols's subpoena for Holmes's gaming records. Numerous pages from the Casino provided information that indicated that Holmes's player's card had been used to wager approximately $20,000 within days of the robbery. The first three pages of the Casino's response, however, consisted of a letter from the Casino's legal counsel that stated, in relevant part:

---

[14]Although the Defendants claim that the jury was improperly instructed regarding the elements of the malicious-prosecution claim, looking at the totality of the district court's instructions, we find no error. *See Wilson v. Morgan*, 477 F.3d 326, 341 (6th Cir. 2007) ("A judgment may be reversed only if the instructions, viewed as a whole, were confusing, misleading, and prejudicial.").

Our office is in receipt of your request for information [regarding Kimberly Holmes] . . . . Detroit Entertainment, L.L.C., may have documentation in its possession prepared and filed in accordance with [federal statute and regulations,] . . . [which] Detroit Entertainment, L.L.C., d/b/a MotorCity Casino believes that it is prohibited from disclosing . . . .We recommend that you contact the Internal Revenue Service to obtain any such documentation filed by . . . MotorCity Casino in connection with [Holmes].

. . . .

I would like to state in writing the position of MotorCity Casino with respect to the documentation you seek. The documentation that MotorCity Casino retains in connection with the play of its customers is *compiled primarily for marketing purposes; it is* not *compiled in a manner that ensures either accurate or full reporting of the time spent at the casino, the time spent gambling, or the actual play (wins or losses) of a customer.* Indeed, if the records indicate slot machine activity, they only reflect the fact that a player's card bearing the identification name was *used—not that the person to whom the card was issued actually used it.* Furthermore, records regarding table game activity are based on periodic visual inspections by various pit employees who then manually input data into the computer system. Note, too, that some entries may simply reflect the fact that a MotorCity Casino employee logged on to the system to check the player's status, thereby *creating the appearance of that player's attendance at the Casino at the time of the log-in when no such attendance occurred.* Accordingly, the documentation *would not establish in any reliable manner the dates of attendance, gambling activities, or winnings or losses of a player.* Therefore, I would advise discretion in utilizing the enclosed information.

Doc. 231-8 (Casino Letter at 2–3) (emphases added). Despite receiving this letter, Sgt. Anderson did not request surveillance tapes from the Casino or otherwise attempt to confirm Holmes's presence and did no further investigation into the accuracy of the records.

At Sykes and Urquhart's criminal trial, the prosecution's principal theory of the case was that the robbery was an inside job and that Holmes had gambled away the loot. Sgt. Anderson was the key witness, and he testified that he had received documentation from the Casino that Holmes had used her player's card to wager around $20,000 immediately following the robbery. The prosecution then admitted into evidence the single page from the Casino that Sgt. Anderson had provided to the prosecution, which

set forth the wagering data that included the amounts that Holmes purportedly lost. As noted, there were several problems with this evidence. First, Sgt. Anderson had not disclosed the existence of the gaming records to the Plaintiffs' defense attorneys prior to trial, so the first time that the defense gained knowledge of the Casino's records was while Sgt. Anderson was on the stand. Second, Sgt. Anderson never revealed to either the prosecution or the defense that the Casino sent anything other than the one page that was introduced as evidence, and he made no mention of the Casino's disclaimer letter at any time. Third, as compared to the original nine-page document that the Casino had sent in response to the subpoena, the one page from the Casino that the prosecution introduced as evidence had been magnified and cropped in a manner that removed the fax time stamps and page numbers, erasing any evidence that it was only one page of a much lengthier document. In other words, there was nothing to put Urquhart or Sykes on notice that the information that Sgt. Anderson was presenting from the Casino on this one page was incomplete.

Following the introduction of the Casino document, the prosecutor proceeded to question Sgt. Anderson about the accuracy of the wagering calculation contained therein:

> Q: "Now you also received some information from Motor City regarding the absolute accuracy of those numbers."
> "A: Yes."
> "Q: What did Motor City convey to you as to . . . whether or not those are absolute hard numbers or if they're just marketing estimates or something like that?"
> . . . .
> Q: . . . "A: These were absolute numbers due to the fact they would have to send to the federal government this paperwork regarding tax information."

Doc. 237 (Anderson Trial Test. at 104–05) (quoting Anderson's testimony from the Plaintiffs' criminal trial). These statements, however, were patently false and directly contradicted the explicit statements in the Casino letter that its calculations were for marketing purposes, were not disclosed to the IRS, and were not reliable indicators of the amount wagered or the identity of the individual who gambled. Sgt. Anderson's failure to disclose this information constituted the basis for the Plaintiffs' *Brady* claim.

**1.    *Brady*-Based § 1983 Due-Process Claim Against Police Officers is Cognizable**

Sgt. Anderson first argues that a due-process claim against a police officer for a *Brady* violation in a 42 U.S.C. § 1983 action is not cognizable.  In *Moldowan v. City of Warren*, a panel of this circuit recently rejected such an argument and held that "the due process guarantees recognized in *Brady* also impose an analogous or derivative obligation on the police," and that a violation of that obligation can result in civil liability.  *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 3504 (2010); *see also Elkins v. Summit Cnty.*, 615 F.3d 671, 676 (6th Cir. 2010).   This panel is without authority to overrule binding precedent, because a published prior panel decision "remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision."  *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).  *Moldowan* clearly forecloses Sgt. Anderson's argument, and his claim is thus without merit.

**2.  The Evidence Was Not Available from Another Source**

Sgt. Anderson next argues that even assuming he was obligated to turn over favorable evidence under *Brady*, that obligation does not apply when the evidence was readily available from another source and that, in this case, the Plaintiffs could have contacted the Casino directly and obtained the information contained in the Casino's letter.  In support of his argument, Sgt. Anderson relies on *Spirko v. Mitchell*, 368 F.3d 603 (6th Cir. 2004), which reaffirmed prior precedent standing for the proposition that if a "defendant was aware of the essential facts that would enable him to take advantage of the exculpatory evidence, the government's failure to disclose [that evidence] d[oes] not violate *Brady*."  *Spirko*, 368 F.3d at 610 (internal quotation marks omitted).

What is fatal to Sgt. Anderson's claim, however, is that the record does not support the conclusion that the Plaintiffs ever possessed the "essential facts," *id.*, that would have enabled them to uncover the evidence at issue.  Trial testimony indicates that at no point prior to trial were the Plaintiffs on notice that Sgt. Anderson possessed

information from the Casino regarding the use of Holmes's gaming card. In fact, the Plaintiffs' defense attorney testified explicitly that the discovery packet "definitely [did] not" contain any documents having to do with gaming activity, Doc. 238 (Richards Trial Test. at 8), and that the "first time" she ever saw any document from the Casino was at trial, *id.* at 19. Additionally, even assuming that the Plaintiffs were on notice that the police had evidence that Holmes had wagered an amount of money that was approximately equal to that which was stolen from the store, this did not place the Plaintiffs "on notice that there was evidence" from the Casino that this information was entirely unreliable. *Spirko*, 368 F.3d at 610; *see also Harris*, 513 F.3d at 518 ("[T]here is no indication that [the defendant] knew or had reason to know" of the existence of the undisclosed evidence). In short, Sgt. Anderson's argument is without merit because there is no evidence in the record indicating that the Plaintiffs possessed any of the facts that would have enabled them to uncover the Casino letter prior to trial.

### 3. The Plaintiffs Proved the Evidence Was Favorable and that They Suffered Prejudice

The next challenge to the jury's verdict on the due-process claim is that insufficient evidence supported the jury's findings that the Casino letter was favorable to the Plaintiffs and that the Plaintiffs suffered prejudice as a result of Sgt. Anderson's failure to disclose the letter. "In *Brady*, the United States Supreme Court imposed upon the prosecutorial arm of the government the obligation to turn over material that is both favorable to the defendant and material to guilt or punishment." *Johnson v. Mitchell*, 585 F.3d 923, 933 (6th Cir. 2009) (internal quotation marks omitted). "Moreover, it is well-settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness." *Id.* (internal quotation marks omitted); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985). "Nevertheless, a *Brady* violation will not result in a grant of relief" unless we can conclude that the evidence the police improperly withheld "'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Johnson*, 585 F.3d at 933 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

We believe that Sgt. Anderson's claim that the undisclosed Casino letter was not "favorable" is entirely without merit. The Casino letter directly contradicts Sgt. Anderson's testimony, and it would have been very powerful impeachment evidence for two reasons. First, the letter clearly indicated that the dollar amounts that the prosecution admitted into evidence to show that Holmes had wagered approximately the same amount of money that was stolen were not reliable. Second, the letter raised serious questions about whether Holmes was even the individual who had wagered the amount of money indicated on the Casino's marketing records, which, if she were not, would have undermined the prosecution's entire theory of the case. From the time that Sgt. Anderson submitted the warrant request until the jury's verdict, the strongest piece of circumstantial evidence of the Plaintiffs' involvement in any criminal activity was Holmes's gambling. With the credibility of the strongest evidence against the Plaintiffs directly called into question, the prosecution's case would have collapsed.

In addition to concluding that the Casino letter was "favorable" to the Plaintiffs, a reasonable jury also could have found that the Plaintiffs were prejudiced as a result of Sgt. Anderson's failure to disclose the evidence because "'there is a reasonable probability'" that, had Sgt. Anderson disclosed the evidence, "'the result of the proceeding would have been different.'" *Apanovitch v. Houk*, 466 F.3d 460, 475 (6th Cir. 2006) (quoting *Strickler v. Greene*, 527 U.S. 263, 280, 282 (1999)). "A 'reasonable probability' of a different outcome exists where the government's suppression of evidence undermines confidence in the outcome of the trial." *Id.* (citing *Kyles*, 514 U.S. at 434, *Bagley*, 473 U.S. at 682, and *Mason v. Mitchell*, 320 F.3d 604, 628 (6th Cir. 2003)). It bears repeating that at the Plaintiffs' criminal trial, the prosecution's theory was that the robbery was an inside job and that Holmes blew the money on a gambling spree. The prosecutor articulated it best in his closing statement:

> "Well, let me tell you, ladies and gentlemen, I'm demanding that you accept the facts in this case because the facts show without a doubt that this was a faked armed robbery, that these two women were in on it, that they covered it up, that Ms. Holmes took the money after the robbers left, after several minutes of colluding with these two women, took the money and ran with it. Those are the facts. I'm demanding that you accept

> these facts . . . And consider this, ladies and gentlemen, here's a woman, Ms. Holmes, who spends almost $25,000 in the casino in three days . . . Think of it this way, okay? Miss Sykes and Ms. Urquhart agreed to make the false report in exchange for money. Ms. Holmes rips them off, later blows the money at the casino. Maybe she's thinking she'll turn it into 50 grand, give them their money and more for me, but she spends the money."

Doc. 261 (Trial Test. at 61–62) (quoting the prosecution's closing argument at the criminal trial). This theory depends, however, on one critical fact that the Casino letter calls into question: Holmes actually gambled a comparable amount of money to that stolen from the Sprint store.

On the record before us, we believe that there is sufficient evidence for a reasonable jury to conclude that the "'result of the proceeding would have been different'" if Sgt. Anderson had disclosed the Casino letter. *See Apanovitch*, 466 F.3d at 475 (quoting *Strickler*, 527 U.S. at 280). Even the prosecutor in the underlying criminal action testified that if he had known about the additional documentation from the Casino, he would have asked different questions regarding the accuracy of numbers introduced into evidence and would have expected Sgt. Anderson to have given different answers. The prosecutor also testified that, had he known about the letter, he would have disclosed it to the Plaintiffs, which implicitly recognizes its value as *Brady* material. Furthermore, the Plaintiffs' defense attorney testified before the jury in the instant case about what she would have done differently had she possessed the Casino letter, specifically asserting that she would have (1) impeached Sgt. Anderson with the letter to undermine the prosecution's theory that the three women worked together and that the money went to fund Holmes's gambling, (2) subpoenaed the Casino records, and (3) called a representative from the Casino to testify as to the manner that the records should have been interpreted. In sum, the defense attorney would have used the fact that both the identity of the gambler and the amount of money that the gambler wagered were unreliable as a vehicle to attack the prosecution's entire case.

This was not a case where the evidence against the Plaintiffs was strong. It was entirely premised on a single piece of circumstantial evidence that the undisclosed letter

completely undermined. For the foregoing reasons, we affirm the judgment of the district court with regard to the Plaintiffs' due-process claims against Sgt. Anderson.

## F. Motion for a New Trial

The Defendants next contend that the district court abused its discretion in denying their motion for a new trial under Federal Rule of Civil Procedure 59(a). "We review a district court's denial of a new-trial motion for abuse of discretion, reversing only if we have a definite and firm conviction that the trial court committed a clear error of judgment." *Radvansky*, 496 F.3d at 614 (internal quotation marks omitted). Granting such a motion necessarily calls into question the legitimacy of the jury's verdict, and given our conclusion that the evidence supported the jury's verdict on the Plaintiffs' claims of false arrest, malicious prosecution, and due-process violations, we likewise conclude that the district court did not abuse its discretion.

## G. Propriety of the Damages Award

### 1. Punitive Damages

Turning to damages, the Defendants first argue that the evidence at trial failed to show that the Defendants' actions were reprehensible enough to support a punitive-damages award. Because the Defendants failed to challenge to the sufficiency of the evidence in their Rule 50(a) motion, however, the matter is waived.[15]

### 2. Remittitur of Damages

The Defendants' final challenge is that the damage award was clearly excessive and that they were entitled to remittitur of both the compensatory and punitive amounts. In the instant case, the jury awarded Sykes $1,063,000 in compensatory damages and $250,000 in punitive damages for her false-imprisonment, malicious-prosecution, and due-process claims. Sgt. Nichols and Sgt. Anderson are jointly and severally liable for

---

[15]We are unconvinced by the Defendants' attempt to recharacterize their challenge to the punitive-damages award as one involving a jury-instruction error. The substance of the Defendants' claim that the evidence at trial could not have satisfied the standard set forth in the jury instruction is no different than the assertion that the evidence at trial did not establish that the Defendants' conduct was sufficiently reprehensible.

the compensatory damages while Sgt. Nichols is liable for only $100,000 of the punitive-damages award. Urquhart received a compensatory-damage award of $1,020,000 for her malicious-prosecution and due-process claims and $250,000 in punitive damages. Again, Sgt. Nichols and Sgt. Anderson are jointly and severally liable for the compensatory-damage award while Sgt. Nichols is liable for only $100,000 of the $250,000 in punitive damages.

"As a general rule," we have "held that a jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004) (internal quotation marks omitted). We review the denial of remittitur under an abuse-of-discretion standard. *Gibson v. Moskowitz*, 523 F.3d 657, 663 (6th Cir. 2008). The district court has discretion to remit a compensatory-damages "verdict only when, after reviewing all the evidence in the light most favorable to the prevailing party, it is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court." *Am. Trim*, 383 F.3d at 475. "If there is any credible evidence to support a verdict, it should not be set aside." *Id.* "Three considerations guide" the inquiry of whether punitive damages are excessive: "(1) the degree of reprehensibility of the conduct; (2) the disparity between the harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages and the civil penalty imposed in comparable cases." *Gibson*, 523 F.3d at 664 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996)).

Although the Plaintiffs argue that the district court did not abuse its discretion in denying the Defendants' motion for remittitur, the district court provided no written explanation for its disposition and merely stated that "[b]eing fully advised . . . [and] having read the pleadings," the district court was denying the motion "for the reasons set forth on the record." Doc. 193 (Dist. Ct. Order 6/25/08 at 2). Unfortunately, however, at the hearing on the Rule 50(b) motion where the district court was presented with the opportunity to address the Defendants' request for remittitur orally, the district

court also declined to set forth an explanation as to why it believed the jury's damages award was supported by the evidence presented. In fact, the district court failed even to mention the Defendants' motion for remittitur at the Rule 50(b) hearing and focused, instead, on the Defendants' challenge to the propriety of punitive damages generally.[16]

Because "the district court . . . did not adequately give the reasons for [its] denial" of the Defendants' motion for remittitur, and failed to "address the parties' arguments" regarding remittitur as presented in their respective post-verdict motions for judgment as a matter of law, we conclude that the district court abused its discretion. *Mich. Division-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 740 (6th Cir. 2008). The district court's complete "lack of explanation . . . greatly hinders our ability to understand its reasoning," *id.*, and because of the deference that we are required to provide to a district court's decision regarding remittitur, we must remand the case to the district court for a statement of reasons regarding the manner in which it chose to exercise its ample discretion and for some justification as to why the jury's award fell within the permissible range.[17]

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court as to liability under 42 U.S.C. § 1983 for false arrest, malicious prosecution, and withholding of evidence in violation of the Plaintiffs' due-process rights. Because the district court failed to articulate a basis for its denial of the Defendants' motion for remittitur, we **REMAND** for the sole purpose of having the district court explain its reasons for denying remittitur. We **HOLD IN ABEYANCE** the Plaintiffs' cross-appeals in Case

---

[16]The district court's discussion of punitive damages generally is unhelpful to our resolution of whether the district court abused its discretion in denying remittitur because it contains no analysis of whether the facts of the case supported the jury's ultimate award. Instead, in denying the Defendants' motion for judgment as a matter of law on the punitive-damages award, the district court relied on the Defendants' failure to challenge the sufficiency of the evidence for the punitive damages award prior to the submission of the case to the jury in their Rule 50(a) motion.

[17]The scope of the mandate on remand is extremely limited and provides only that the district court explain the denial of the Defendants' motion. We express no opinion as to the propriety of that decision, which we will address upon receipt of the district court's explanation.

Numbers 08-2090 and 08-2118 pending our later review of the district court's statement of reasons with regard to remittitur.