**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0893n.06

No. 11-1780

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

***Aug 14, 2012***

LEONARD GREEN, Clerk

| | |
|---|---|
| FAWAZ GHAITH, | ) |
| | ) |
| Plaintiff-Appellant, | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| v. | ) COURT FOR THE EASTERN |
| | ) DISTRICT OF MICHIGAN |
| DON RAUSCHENBERGER, JR., RICHARD I. | ) |
| DRESSER, and SCOTT GORDON, | ) |
| | ) |
| Defendants-Appellees. | |

Before:     **BATCHELDER, Chief Circuit Judge, KEITH and DONALD, Circuit Judges.**

**DAMON J. KEITH, Circuit Judge**.  Plaintiff-Appellant Fawaz Ghaith ("Ghaith") appeals a district court order granting the defendants' motion for summary judgment and dismissing his § 1983 civil rights complaint against several state police officers and county prosecutors.  Ghaith was arrested and charged with four counts of extortion after he reportedly made various threats to his daughter and other members of his family.  After a mistrial, prosecutors dropped the charges when they were unable to confirm that Ghaith actually made the threatening phone calls that formed the basis of the charges.  Ghaith then brought this federal civil rights suit against the state officials, his wife, and his in-laws, alleging that they conspired to have him falsely arrested and charged with extortion so that his wife, who lived in Jordan with their children at the time, could renew her youngest son's passport, leave the country with her children, and divorce Ghaith.  The facts of this case are troubling, but the evidence establishes that the police officers had probable cause to believe

that Ghaith threatened his family and nothing in the record supports Ghaith's claims that his rights

to parent his children and be free from excessive bail were violated. Accordingly, we **AFFIRM**.

I.

A.

At the time of the events leading to this lawsuit, Ghaith and Dawn Ghaith ("Dawn") were

married with four children: Lana, Mohammed, Samer, and Hanan. Both Ghaith and Dawn were dual

United States-Jordanian citizens with a permanent residence in Jordan, but Ghaith divided his time

between Jordan and the United States, where he worked as a truck driver for a company called

Schneider National. By August 2008, Dawn had decided that she wished to divorce Ghaith and

return to the United States with their children to live closer to her mother and stepfather, Marion and

Jerry Breasbois, who lived near Bay City, Michigan. The main obstacle to her leaving was the fact

that their youngest son, Samer, would not be able to leave Jordan until his expired Jordanian passport

was renewed. Under Jordanian law, Samer's passport could only be renewed by Samer's father,

Ghaith, unless Ghaith was dead or in prison.

Hanan, the couple's eldest daughter, who had a valid passport, traveled to the United States

in August 2008 to live with her grandparents, Marion and Jerry Breasbois. Hanan left Jordan after

Ghaith's brother (Hanan's uncle) reportedly beat her at Ghaith's instruction for talking with boys on

her mobile phone. Ghaith, who was in the United States at the time for work, called his daughter

when he learned that she was in the country. They spoke several times between August 28 and

September 2, 2008, and their conversations were described by Ghaith as "pleasant." Also during this

time period, Ghaith received and accepted an invitation from his in-laws to have dinner at their house in Michigan on September 2, 2008.

Unbeknownst to Ghaith, the Breasboises contacted the Gladwin County Sheriff on August 29, 2008, to report that Ghaith was harassing and threatening them and their granddaughter, Hanan. The Breasboises also contacted the Michigan State Police to make the same report. Ghaith alleges that these reports were false and that his in-laws conspired with Dawn to have him arrested and prosecuted so that Dawn could renew Samer's passport under Jordanian law and return to Michigan with all of her children. Still unaware of the complaint against him, on September 1, 2008, Ghaith confirmed the invitation to have dinner at the Breasboises' house at 5:00 p.m. the following day. On September 2, 2008, the Breasboises contacted Defendant-Appellee Detective Don Rauschenberger of the Michigan State Police to report that Ghaith was coming to their home at 5:00 p.m. that evening to take Hanan back to Jordan and that Ghaith had threatened to kill them if they stood in his way.

B.

Rauschenberger came to the Breasboises' home at approximately 1:00 p.m. on September 2, 2008, to interview the Breasboises and Hanan about Ghaith's alleged threats. Rauschenberger stated that immediately upon arriving, he was told that Ghaith had just called to say that he was about 300 miles away and would arrive at the Breasboises' home that evening. What transpired while Rauschenberger was at the Breasboises' home forms the heart of the dispute in this appeal. Rauschenberger's police report indicates that he was in the home from approximately 1:00 p.m. to 3:00 p.m. The Breasboises' phone records indicate that Ghaith called their home at 1:25 p.m. and

that the call lasted about 21 minutes. In his report, Rauschenberger described his interview with Hanan, who explained that her uncle had beaten her and that she left Jordan in response, which made her father very angry. Rauschenberger's report also states that Marion told him about Ghaith's past history of physically abusing his wife, Dawn, that Ghaith made threats on the telephone directly to Marion, and that Ghaith expressed his intent to retrieve Hanan and "kill anyone who gets in his way." The report further notes that Dawn called the house while Rauschenberger was there and that she expressed her concern that Ghaith would follow through on his threats. Dawn also told Rauschenberger that she could not leave Jordan because of Samer's expired passport and that she could not renew it without Ghaith's permission. The report states that Rauschenberger made arrangements to take Marion and Hanan to a women's shelter, that he asked them to prepare written statements, and that Jerry remained at the house. The report does not mention the 21 minute phone call from Ghaith to the Breasboises' home at 1:25 p.m.

The report also describes Rauschenberger's contact with Schneider National, the trucking company for which Ghaith worked. It states that Rauschenberger spoke with Ghaith's supervisor, who confirmed that Ghaith's truck was in Indianapolis as of 10:30 a.m. and that Ghaith had expressed his need to get to Michigan because of "family trouble with his daughter." Ghaith's supervisor reportedly said that Ghaith "seemed pretty serious about" his family troubles. Rauschenberger asked Hanan to call Ghaith later that day from the police station to get Ghaith to make statements that would confirm the reports, but they were unable to reach Ghaith on the phone. The report states that Rauschenberger contacted the Bay County Prosecutor's Office and that Defendant-Appellee Scott Gordon stated he felt there was enough probable cause to arrest Ghaith

for extortion. (Gordon stated in an affidavit that he generally recalls having a conversation with Rauschenberger, but that it would not be his usual practice to declare whether he believed probable cause existed.)

C.

Ghaith arrived at the Breasboises' home with groceries for dinner at about 5:00 p.m. on September 2. Nobody was home, so Ghaith waited in the car and called Dawn in Jordan. He twice called the Breasboises' home just after 6:00 p.m., but there was no answer. Once notified that Ghaith was at the house, Rauschenberger returned there with State Police Officers Michael Newsham and Mark E. Burch at about 7:20 p.m. The officers approached and arrested Ghaith, who was still waiting in his car in the driveway.

There are factual disputes regarding what each party said and did after Ghaith was arrested. When told why he was being arrested, Ghaith reportedly told Rauschenberger that it was a misunderstanding based on a "communication error" and that "these people have no right to interfere with my family." (In his affidavit, Ghaith denies having said this.) The officers searched his vehicle, finding no weapons or contraband. Ghaith alleges that, upon handcuffing him, Rauschenberger said that "the girls over here do what they want when they are eighteen." Contradicting Rauschenberger's statements, Ghaith contends that Rauschenberger never read him his *Miranda* rights and denies having told the police officers not to touch the Koran in his car—indeed, he claims there was no Koran in his car. He further denies saying there was a "communication error" with his daughter and denies that Rauschenberger asked him whether his daughter speaks Arabic. He denies telling Rauschenberger that he spoke to Hanan or Marion around 3:00 or 3:30 that afternoon. And he denies

telling Rauschenberger to look at his phone to check the call history to confirm those calls. After a preliminary hearing, Ghaith was charged with four counts of extortion, and transported to the Bay County Jail where he was held on a $500,000 bond.

Jordanian authorities were informed of Ghaith's arrest and Samer was issued a new passport. Rauschenberger provided a copy of his police report to the United States embassy in Jordan after receiving approval from Defendant-Appellee Richard Dresser, a county prosecutor. After Samer's passport problem was resolved, Dawn traveled to the United States with Samer, Lana, and Mohammed, arriving on September 11, 2008.

## D.

Ghaith was tried on the extortion charges, but a mistrial resulted when the jury could not reach a verdict. On the eve of the new trial, the Bay County Prosecutor's Office dismissed all of the charges against Ghaith and released him from jail after investigators were unable to confirm the threatening phone calls Ghaith allegedly made because of discrepancies between the reported times of the calls and Ghaith's phone records. Ghaith had spent 196 days in custody.

Ghaith sued in federal court under 42 U.S.C. § 1983, asserting that his constitutional rights were violated by several state officials, including Detective Rauschenberger and Bay County Prosecutors Richard Dresser and Scott Gordon. He also raised several claims under Michigan tort law. As to his federal claims, Ghaith alleged that the defendants conspired to violate his constitutional right to parent under the Fourteenth Amendment by "fraudulently procuring a Jordanian passport" for Samer and "conspiring to circumvent" Jordanian law. He also alleged that his arrest, the $500,000 bond set before trial, and his trial violated the following rights: his right to

be free from false arrest, unreasonable search and seizure, and malicious prosecution; his rights to a fair trial; and his right to be free from excessive bail. He also raised a § 1985 claim based on an alleged conspiracy among the defendants to violate his civil rights and a *Monell* claim seeking municipal liability under § 1983. Dawn, who was originally named as a defendant, filed a motion for judgment on the pleadings on the grounds that she was not a state actor and therefore could not be liable under § 1983. The district court granted her motion as to the federal claims. The police officers and prosecutors filed motions for summary judgment, and the district court, finding that the defendants were entitled to qualified or absolute immunity because Ghaith's constitutional rights were not violated, granted the motions on March 10, 2011. The court entered a final order on May 23, 2011, after finding that it did not have jurisdiction over the remaining state law claims. Ghaith appealed.[1]

## II.

### A.

We review a district court's grant of a motion for summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of the non-moving party. *Ireland v. Tunis*, 113 F.3d 1435, 1440 (6th Cir. 1997). Summary judgment is proper if, after viewing the evidence that way, there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(a). The moving party has "the burden of showing the absence of a

---

[1] On appeal, Ghaith argues only that the district court improperly dismissed the claims against the police officers (Rauschenberger, Newsham, and Burch) and the prosecutors (Dresser and Gordon). Accordingly, we limit our review to those issues.

genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A

genuine issue of material fact exists when there are "disputes over facts that might affect the outcome

of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When faced with a properly-supported summary judgment motion, the non-movant must provide

"significant probative evidence" to defeat the motion. *Id.* In reviewing the record at the summary

judgment stage, we do not make credibility determinations, weigh the respective value of evidence,

or resolve material factual disputes. *See Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006).

B.

Ghaith raises several issues on appeal related to his § 1983 claims. He mainly argues that

he was arrested without probable cause, in violation of the Fourth Amendment, and that the district

court improperly held that the officers had probable cause. He also argues that his constitutional

right to parent and his right to be free from excessive bail were violated by the defendants. We

review each issue in turn.

1. Probable cause for extortion

Section 1983 provides for civil liability for a state actor acting under color of law who

deprives someone of their constitutional rights. 42 U.S.C. § 1983. Ghaith claims that his arrest

violated the Fourth Amendment because Rauschenberger made false statements in official

documents in an effort to establish probable cause, which Ghaith argues the officers did not, in fact,

have. Ghaith concedes that his Fourth Amendment claims against the state defendants depend upon

the officers' lacking probable cause to arrest him for extortion.

The Fourth Amendment prohibits unreasonable searches and seizures, including arrests, but a "warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed," *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The Supreme Court has explained that "'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). But an arrest supported by probable cause nonetheless is improper if the police officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood and such statements or omissions [we]re material, or necessary, to the finding of probable cause." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (internal quotation marks and citations omitted); *see also Hinchman v. Moore*, 312 F.3d 198, 205-06 (6th Cir. 2002) ("Falsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional . . . .")

State officials are shielded from liability in a § 1983 case by qualified immunity where (1) there has been no violation of a constitutional right or (2) the right at issue was not "clearly established at the time of [the] defendant's alleged misconduct." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (citations and quotation marks omitted). Courts may examine these two prongs in either order and a failure to satisfy either prong is fatal to the plaintiff's claims. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

The offense for which Ghaith was arrested is the Michigan crime of extortion. In Michigan, anyone who "threaten[s] any injury to the person or property or mother, father, husband, wife or child of another with intent thereby to . . . compel the person so threatened to do or refrain from doing any act against his will" has committed felony extortion. Mich. Comp. Laws § 750.213. Ghaith does not argue that the threats—if made—would not constitute extortion, so the main question before us is whether there was probable cause to believe that Ghaith made the threats as alleged. The district court concluded that the police officers were entitled to qualified immunity because the officers had probable cause to believe Ghaith threatened his family and therefore there was no constitutional violation for arresting him. Specifically, it held, "[t]he credible reports of Hanan, Dawn, and Marion Breasbois suggesting that [Ghaith] threatened to kill them if Hanan did not return to Jordan established probable cause to arrest [Ghaith] for extortion." We agree.

Ghaith argues that Rauschenberger's failure to mention the 21-minute phone call that took place while he was reportedly in the Breasboises' home constitutes a deliberate false statement that undermines the existence of probable cause. Ghaith, however, does not point to specific facts establishing that Rauschenberger knew about this phone call. He argues that "Rauschenberger manipulated his account of the arrest to support his decision that there was probable cause," and "select[ed] information that would show [Ghaith's] alleged criminal intentions while editing out information that would contradict such a showing." And when that purported omission is coupled with Rauschenberger's allegedly false statements about his remarks and actions when he arrested

Ghaith, Ghaith argues that "there was ample evidence to show that Rauschenberger was prejudiced against [Ghaith] and sought to railroad him on the basis of his ethnicity and religion."

Rauschenberger responds that "the facts supporting probable cause to arrest Ghaith are legion." He points to (1) Marion's original phone call reporting the threats; (2) the "exigency of the situation" given that Ghaith reportedly was only 300 miles away; (3) Marion's and Hanan's similar description of the threats in their interviews; (4) Dawn's report on the phone of the threats; (5) the circumstances described by Ghaith's manager at the trucking company; (6) the apparent sincerity of the family's fears; and (7) Ghaith's behavior and statements when confronted by Rauschenberger with the allegations. In essence, Rauschenberger argues that any factual disputes that exist are immaterial to determining whether probable cause existed at the time of Ghaith's arrest. Even after ignoring the last point, which does not speak to the facts that were known to the officer at the time of arrest, Rauschenberger is correct.

To be sure, Ghaith's affidavit submitted in opposition to the motion for summary judgment creates numerous factual disputes in this case. But nearly every dispute involves purported statements or actions by the parties that took place *after* Ghaith was arrested, and none of them significantly affects whether there was probable cause. The undisputed facts show that the police received credible reports of serious threats made by Ghaith and that the subsequent investigation corroborated those reports. It is strange that Rauschenberger's police report fails to mention the 21-minute phone call from Ghaith, but there is no evidence from which we can infer that Rauschenberger actually knew that phone call was made. And, more broadly, there is no evidence from which a reasonable jury could infer that the various state defendants entered into a conspiracy

with Ghaith's family to have him arrested without justification. In the end, the fact that the phone call was not mentioned does not undermine all of the other facts known to the officers at the time indicating that Ghaith may have threatened his family.

The cases relied upon by Ghaith involve deliberate or reckless misstatements or omissions by police officers that materially affected whether there was probable cause in the first place, not whether the police officers harbored some personal prejudice or bias. *See, e.g.*, *Sykes v. Anderson*, 625 F.3d 294, 301-02 (6th Cir. 2010); *Miller v. Prince George's Cnty.*, 475 F.3d 621, 626-27 (4th Cir. 2007). Although some of the statements Rauschenberger allegedly made may show that he was biased, none of the factual disputes arising from those statements affects the probable cause determination. In other words, Rauschenberger's purported bias does not change what a reasonable police officer could have believed here. *Cf. Scott v. United States*, 436 U.S. 128, 138 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.") Because there was probable cause at the time of arrest that Ghaith committed extortion by threatening his family, the district court properly held that there was no constitutional violation and the state police officers are entitled to qualified immunity.[2] And because a lack of probable cause is an element of a federal malicious prosecution claim, *see Sykes*, 625 F.3d at 308-09, our conclusion precludes Ghaith's claim to this effect. Accordingly, we affirm the dismissal of the federal malicious prosecution claims.

---

[2]Having concluded there was probable cause here, we do not address the parties' arguments regarding whether collateral estoppel should prevent Ghaith from challenging the existence of probable cause in this appeal.

We next address the claims against Defendants-Appellees Dresser and Gordon, the Bay County Prosecutors. Because prosecutors are not absolutely immune when they are acting in an investigative manner, rather than as advocates, *see Buckley v. Fitzsimmons*, 509 U.S. 259, 273-74 (1993), we focus on qualified immunity. The district court, having found that probable cause existed, held that Dresser and Gordon are entitled to qualified immunity because "[t]here is no factual support or legal authority for [the] assertion that the prosecutors violated [Ghaith's] constitutional rights, much less a clearly established right. Although [the prosecutors] provided advice to Rauschenberger, there is no indication that the advice was wrong, much less constitutionally prohibited." Ghaith summarily argues that Dresser and Gordon are not entitled to immunity because there is "a factual question about whether the prosecutors willfully disregarded evidence that would have led away from a conclusion that there was probable cause to arrest" Ghaith. But Ghaith does not point to any evidence in the record that creates such a factual question or that suggests they disregarded evidence. Accordingly, Dresser and Gordon are entitled to summary judgment and the district court properly dismissed the claims against them.

## 2. Right to parent

Ghaith claims that Rauschenberger violated his constitutionally-protected right to parent by notifying the Jordanian embassy of his arrest to facilitate Dawn's efforts to take Samer to the United States. The Supreme Court has recognized that the Fourteenth Amendment, through Substantive Due Process, provides parents with a right to make decisions regarding the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000). *See also Smith v. City of Fontana*, 818 F.2d 1411, 1418-19 (9th Cir. 1987). Courts (particularly the U.S. Supreme Court) have not

thoroughly addressed the scope of this right in the context of a criminal investigation, but the available case law suggests that a state actor's conduct affecting this right must "shock the conscience" to be actionable under § 1983. *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1079 (9th Cir. 2011); *see also id.* ("A parent has a fundamental liberty interest in companionship with his or her child. A state may not interfere with this liberty interest, and indeed the violation of the right to family integrity is subject to remedy under § 1983. To amount to a violation of substantive due process, however, the harmful conduct must shock the conscience or offend the community's sense of fair play and decency." (internal quotation marks and citations omitted)).

Ghaith argues that the police officers violated his constitutional right to parent by "intentionally interfer[ing] with his relationship with his children." Specifically, he argues that Rauschenberger learned about the status of Samer's passport—namely, that it could only be renewed without Ghaith's permission if he were dead or in jail—and that Rauschenberger's decision, made with Dresser's approval, to notify the Jordanian embassy of Ghaith's arrest violated his right to parent. But aside from this generalized allegation of a conspiracy, Ghaith has not pointed to specific acts by Rauschenberger or any other defendant that interfered with his right to family integrity that a reasonable jury could conclude "shock the conscience." Putting aside the question whether the scope of Ghaith's right to parent in this context was clearly established at the time of Rauschenberger's actions,[3] Ghaith's generalized allegations are insufficient to establish a

---

[3]Although it is "clearly established that the Constitution recognizes . . . a substantive fundamental right to raise one's child," *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000), the dearth of guidance on the scope of this right in the relevant context suggests it likely is not sufficiently clearly established to defeat qualified immunity.

constitutional violation or create a material factual dispute. The district court properly granted summary judgment for the defendants on this claim.

### 3. Excessive bail

Finally, Ghaith argues that his Eighth Amendment right to be free from excessive bail was violated when the state court bound him over for trial and set bail at $500,000 at the preliminary hearing. The district court dismissed this claim, noting that Ghaith had not cited any cases or explained why the police officers or prosecutors would be individually liable under § 1983 based on the court's imposition of a bond. None of the defendants in this appeal was directly involved in the state court's decision to impose the $500,000 bond.[4] Nevertheless, Ghaith argues on appeal that the district court "overlook[ed] the fact that the police officers and prosecutors manipulated the state court's decision regarding bail by making false statements and distorting the facts in an effort to show that Plaintiff should be associated with the dangers of Islamic fundamentalist terrorists." This argument is meritless. Ghaith does not offer any cases or point to specific facts that suggest that any of the defendants could be liable for the state court's imposing a $500,000 bond. The district court properly dismissed this claim.

### III.

For the foregoing reasons, the district court's judgment is AFFIRMED.

---

[4]Moreover, to the extent Ghaith implicitly argues that the prosecutors' appearing at a bond hearing and arguing against a reduction in bond is the relevant conduct, the prosecutors would be shielded by absolute prosecutorial immunity for such conduct since they were acting as advocates. *See Buckley*, 509 U.S. at 273-74.