## NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 15a0606n.06

Case No. 14-6323

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 26, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| PLEAS LUCIAN KAVANAUGH, | ) | |
| Plaintiff-Appellant, | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| LEXINGTON FAYETTE URBAN COUNTY | ) | THE EASTERN DISTRICT OF |
| GOVERNMENT, et al. | ) | KENTUCKY |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | OPINION |
| | ) | |

Before: SUTTON and DONALD, Circuit Judges; and ZOUHARY, District Judge.[*]

**BERNICE BOUIE DONALD, Circuit Judge.** Pleas Lucian Kavanaugh ("Kavanaugh") appeals a district court order granting summary judgment to the defendants on his civil rights claims. In 2009, Kavanaugh was arrested in connection with two separate attacks on women in Lexington, Kentucky. A grand jury indicted him, and after his motion to sever the charges was granted, he proceeded to trial regarding the first of the two attacks. A jury acquitted Kavanaugh regarding the first attack, and the prosecutor dropped the charges regarding the second attack. In 2013, Kavanaugh filed a state law and federal civil rights action under 42 U.S.C. § 1983 for malicious prosecution. He also claimed that the local government violated

---

[*]The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

§ 1983 by maintaining a policy or custom of inaction regarding officer misconduct and failing to train those officers appropriately. The defendants moved for summary judgment, which the district court granted. We **AFFIRM**.

I.

This case arose from the defendants' investigations into two incidents in downtown Lexington, Kentucky, in late 2009. The first involves an attack on Morgan Persley ("Morgan"), the 23-year-old daughter of defendant Detective William Persley ("Persley"). On October 24, 2009, Morgan departed a bar after an argument with her then-boyfriend. It was shortly after 1:00 in the morning, so as she walked down the street, Morgan called a friend on her cell phone to come retrieve her. Still on the call with her friend, Morgan came to a stop under a streetlight about three or four blocks from the bar. While she stood in the same spot, she observed a man walk past her; Morgan acknowledged him and kept talking on her phone. The man passed her again, this time from the opposite direction, and Morgan took note of him more cautiously. As she hung up her phone, the man approached her a third time, grabbed her from behind, and dragged her away from the street. Morgan struggled with her assailant, sustaining several bruises and scrapes, and ultimately broke free. After the attack, Morgan no longer had her cell phone or her keys.

Responding officers collected blood samples from the scene of Morgan's attack. Morgan was able to describe her attacker in general terms, but was unable to provide sufficient facial details for a composite sketch. Detective Elizabeth Adams ("Adams") was assigned as the lead detective for the incident. Without further information, however, the investigation stalled until a second incident occurred three months later.

The attack on Laura Baker ("Baker") took place on December 8, 2009. Baker was sitting on a bench at a Transit Center bus stop when a man sat down beside her. The man kept staring at her, so Baker asked if she knew him; he replied, "no, but I'd like to get to know you." He then asked if she knew where to get some dope. When Baker responded that she did not, the man pulled out a plastic baggie with what appeared to be cocaine inside. He asked her to leave with him to do some of the (alleged) cocaine. He dropped the baggie on the ground as a police officer emerged from the Transit Center. The man then pulled a "large silver colored pocket knife" from his pocket and held it to Baker's side, telling her repeatedly that she "was leaving with him." When a bus pulled up to the stop, Baker ran onto the bus and asked the driver to call police. The suspect walked away.

The responding officer took an initial statement from Baker, filed a report, and brought Baker to meet Detective Adams. Adams wrote a report of their conversation. The following day, Baker met with Detective Leah Anderson ("Anderson") to generate a composite sketch of her attacker. While Adams drove Baker to and from the appointment with Anderson, Adams did not accompany Baker during the development of the composite sketch. Persley was assigned as the lead detective for the Baker investigation.

On December 10, 2009, Adams and Persley compared notes on the similar descriptions of the suspects in the attacks on Morgan and Baker. Adams reviewed the composite, generated the previous day with Baker, and noted that it bore a resemblance to Kavanaugh, who had been a suspect in a previous case. Adams then prepared a photographic line-up of six men, including Kavanaugh, which was shown separately to Morgan and to Baker. All men in the line-up were black. However, four had darker skin and two had lighter skin; Kavanaugh was one of the two with lighter skin. Both women identified Kavanaugh as their attacker. Based on these

identifications, the detectives swore out arrest warrants for Kavanaugh related to both incidents. Kavanaugh was arrested five days later, and his DNA was collected to be compared with the blood samples found at the scene of Morgan's attack. Adams and Persley testified before a grand jury, at which time Adams testified that the results of the DNA tests regarding the attack on Morgan were unavailable. The grand jury indicted Kavanaugh regarding both incidents.

Kavanaugh was first tried for the attack on Morgan. Before the trial began, Kavanaugh filed a motion to suppress Morgan's line-up identification of Kavanaugh, claiming it was impermissibly suggestive because only two of the six photographs featured light-skinned black men. The trial court agreed, and suppressed the line-up identification. However, the court allowed Morgan to identify her assailant during the trial itself. Despite Morgan's identification, the jury acquitted Kavanaugh of robbery in August 2011. In light of the trial judge's decision to suppress the photographic line-up evidence in Morgan's case (along with any reference to the Baker composite sketch from which it was derived), the prosecutor dismissed the charges against Kavanaugh regarding the attack on Baker.[1]

Kavanaugh filed the present action in March 2012 against the Lexington Fayette Urban County Government ("LFUCG"), Chief of Police Ronnie Bastin ("Bastin"), Adams, Persley, and other unidentified defendants.[2] Kavanaugh claims, *inter alia*, that the defendants violated state law and 42 U.S.C. § 1983 when they maliciously prosecuted him for the crimes against Morgan and Baker, and that the prosecution was based on the LFUCG's policy or custom of inaction in responding to officer dishonesty and failure to train or supervise its officers. The defendants

---

[1]The prosecutor explained that, "[b]ecause [the judge], in my opinion, had improperly excluded Laura Baker's matter, as well as the sketch drawing and line-up from the prosecution involving Morgan Persley's charges, and he was the same judge who would be hearing Laura Baker's matter, it was my decision to not go forward with prosecuting Mr. Kavanaugh in the case involving Laura Baker's charges."

[2]Among his claims, Kavanaugh sued Bastin, Adams, and Persley individually and in their official capacities, and sued LFUCG for direct liability and on a theory of respondeat superior.

moved for summary judgment. The district court granted summary judgment to the defendants on Kavanaugh's federal claims, declined supplemental jurisdiction on his state-law claims, and dismissed the case. Kavanaugh appeals.

II.

A.

We review a district court grant of summary judgment de novo. *Ramsey v. Penn Mut. Life Ins. Co.*, 787 F.3d 813, 818 (6th Cir. 2015). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that its opponent has not presented sufficient evidence to support its case. *Martin Cnty. Coal Corp. v. Universal Underwriters Ins. Co.*, 727 F.3d 589, 593 (6th Cir. 2013). Once the moving party has satisfied this burden, then it is the nonmoving party's burden "to set forth specific facts showing a triable issue." *Id*. (citing *Mosholder v. Barnhardt*, 679 F.3d 443, 448-49 (6th Cir. 2012)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(e). The nonmoving party must make this evidentiary showing regarding *each* of the essential elements of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (Summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.") The nonmoving party must present something more than mere speculation or allegations: there must be probative evidence upon which a jury could reasonably find for the nonmovant. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *see also Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 326 (6th Cir. 2015).

When considering a motion for summary judgment, we must consider all the evidence, facts, and inferences in the light most favorable to the nonmoving party. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399 (6th Cir. 2010) (citing *Matsushita*, 475 U.S. at 587). In short, we must determine "whether the evidence is so one-sided that the moving party must prevail as a matter of law." *Martin*, 727 F.3d at 593.

Though Kavanaugh initially asserted several causes of action against the defendants, he only addressed two in his response to the motion for summary judgment: 1) his claim that Adams and Persley maliciously prosecuted him in violation of state law and 42 U.S.C. § 1983; and 2) his claim that LFUCG and Bastin violated 42 U.S.C. § 1983 by maintaining a policy or custom of inaction in the face of dishonesty on the part of its officers and failing to train them. These were the only claims addressed by the district court below, and they remain the only claims before this Court on appeal.

B.

As a preliminary matter, the district court determined that Kavanaugh's claim for malicious prosecution under 42 U.S.C. § 1983 was effectively asserted only against Adams and Persley, and only in their individual capacities.[3] Kavanaugh does not contest this determination on appeal.

---

[3]The district court noted that Kavanaugh had conceded he was not alleging that Bastin maliciously prosecuted him. The court also concluded that the malicious prosecution claim against LFUCG and the detectives in their official capacities "fail[ed] because a government entity cannot be held liable under § 1983 for the constitutional torts of its employees under a *respondeat superior* theory." Kavanaugh failed to assert any facts to support a claim of liability

To succeed on a claim under § 1983 for malicious prosecution, Kavanaugh must prove four essential elements: 1) that a criminal prosecution was initiated against him, and that Adams and Persley "made, influenced, or participated in the decision to prosecute[;]" 2) that there was a lack of probable cause to support the prosecution; 3) that he suffered a "deprivation of liberty" (as understood under this Court's Fourth Amendment jurisprudence) as a consequence of the legal proceeding; and 4) that the legal proceeding was resolved in Kavanaugh's favor. *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010) (quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007) (regarding the first element) (internal quotation marks and modifications omitted); *Johnson v. Knorr*, 477 F.3d 75, 81 (3d Cir. 2007) (regarding the third element)). Thus, if Kavanaugh fails to present more than "a scintilla of evidence" on any of these elements, Adams and Persley must be granted summary judgment on the claim. *Anderson*, 477 U.S. at 252; *see also Celotex*, 477 U.S. at 322; *Peterson v. Johnson,* 714 F.3d 905, 910 (6th Cir. 2013).

1.

Kavanaugh primarily argues that Adams and Persley lacked probable cause to pursue him. "[P]robable cause to initiate a criminal prosecution exists where 'facts and circumstances are sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged.'" *Webb v. United States*, 789 F.3d 647, 666 (6th Cir. 2015) (quoting *MacDermid v. Discover Fin. Servs.*, 342 F. App'x 138, 146 (6th Cir. 2009) (modification omitted)). We view his arguments in light of "the totality of the circumstances at the time of [Kavanaugh's] arrest and through the time that the criminal proceeding against [him] commenced." *Sykes*, 625 F.3d at 311.

---

on a policy-or-custom-of-malicious-prosecution theory. Thus, the only § 1983 claim for malicious prosecution that remained was that asserted against Adams and Persley in their individual capacities.

Kavanaugh must present evidence to overcome several legal presumptions that Adams and Persley had probable cause. Law enforcement officers are entitled to rely on an eyewitness identification of a suspect to establish the probable cause necessary for an arrest. *United States v. Lanier*, 636 F.3d 228, 233 (6th Cir. 2011); *see also Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). Where an arrest is made pursuant to a valid warrant, that document is also "normally a complete defense to a federal constitutional claim" under §1983. *Robertson v. Lucas*, 753 F.3d 606, 618 (6th Cir. 2014) (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) (internal citation omitted)). Similarly, as a general rule, "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006).

An exception to these rules exists where officers procure an identification or warrant by making "material false statements either knowingly or in reckless disregard for the truth." *Scott v. Kelley*, No. CIV.A. 2010-77 WOB, 2012 WL 479896, at *4 (E.D. Ky. Feb. 14, 2012) *aff'd sub nom. Scott v. Sanders*, 482 F. App'x 996 (6th Cir. 2012); *Ghaith v. Rauschenberger*, 493 F. App'x 731, 736 (6th Cir. 2012); *see also Sykes*, 625 F.3d at 312 (citing *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006)); *Robertson*, 753 F.3d at 616. For Kavanaugh to survive summary judgment, therefore, he must make a showing that the eyewitness identification, warrant, and indictment against him rested on false testimony or material false statements made by Adams and Persley in pursuit of his arrest or prosecution.

a.

Kavanaugh makes several interrelated arguments that Adams and Persley lacked probable cause. At the core of these arguments is his theory that Adams and Persley improperly steered the investigation to ensure that the victims would identify Kavanaugh as their attacker; in short,

that the detectives framed him. Kavanaugh identifies several particulars in which the victims' descriptions of their assailant differ from the resulting investigation documents and insists that he does not match these descriptions. He claims that Adams and Persley made suggestive statements to Morgan and Baker about Kavanaugh's alleged prior acts to influence the women to describe and identify him. Kavanaugh vaguely alleges that Adams either never conducted a photographic line-up or used it improperly, and emphasizes that he "would have never been a suspect in either crime if not for Adams' involvement." He argues that Adams lied to the grand jury about the DNA test results in Morgan's case. The variations on this theme are numerous, but they share one of two recurring flaws: they are either unsupported by the record or they misrepresent the record in context.

It is true that there were differences in the details regarding the identification of the suspect in the attacks on Morgan and Baker, but these differences are minor in light of what is consistent in the record. Kavanaugh states that he is 5' 11" tall, is completely bald, is black with light skin, and has brown eyes. He repeatedly claims that this contradicts the characteristics described to police by Morgan and Baker. However, the record reveals that Morgan and Baker's descriptions were relatively consistent regarding their attacker's skin tone, hair, build, and height. Morgan described her assailant as a light-skinned black or Arabic man in her initial description and later testimony. Baker initially described her assailant as "a very light-skinned male black or bi-racial" man, which was consistent with her later testimony and with the composite sketch she generated with Anderson the day after her attack.

Kavanaugh asserts that Morgan and Baker never identified the suspect as bald. Strictly speaking, this is true: neither woman used the term "bald." But both women consistently stated that the suspect's head was buzzed or close-shaven or that they saw no hair at all. Merriam-

Webster's dictionary states that a "bald" person is one who "[has] no hair or very little hair on the head." Merriam-Webster Online, available at http://www.merriam-webster.com/dictionary/bald. Morgan and Baker's descriptions are consistent with this definition.

Kavanaugh emphasizes that neither woman stated the suspect had brown eyes, yet this characteristic nonetheless entered the record in the general investigative reports regarding both incidents. By contrast, he notes that at one point, Baker stated that her attacker had green eyes or contacts. He does not, however, make the necessary connections between these discrepancies and his legal theory to survive summary judgment.

Aside from the fact that these variations are minor in context, many of them do not logically connect to the defendants in question. The initial description of the attacker in Morgan's case was taken by a responding officer, not Adams or Persley; it was this officer who included "brown eyes" and "black hair" in the report. The initial case reports regarding Baker's encounter—including the one authored by Adams—do not identify the attacker's eye or hair color at all, and the general investigative report identifying her attacker as having brown eyes and black hair was filled out by a responding officer, not Adams. But Kavanaugh concludes—without legal support of any kind—that these discrepancies demonstrate that Adams and Persley somehow tailored the investigation documents so that the witnesses would implicate Kavanaugh. His assertion does not establish grounds to escape summary judgment.

b.

Nor does Kavanaugh make a showing that Adams and Persley influenced Morgan and Baker to identify him through statements about his alleged past acts. In his brief, Kavanaugh explains this argument thus:

> Immediately after the attack, Ms. Baker stated that the following occurred:
>
> "And then more cops came on bicycles and from the police station across the street. They took me over there and took my statement. A few minutes later they went out looking for him. Well, the description I gave of him was someone they were already looking for, I guess. He was wanted for a few other rapes and an attack on a pregnant woman and an attack on a police officer's daughter or some, something to that affect. They said I couldn't have gave a better description of him."
>
> . . .
>
> Was Ms. Baker just making these comments, which are absolutely unduly suggestive and improper, up out of thin air?
>
> . . .
>
> There is absolutely no doubt that, well prior to her deposition, Ms. Baker was told by the investigating officers that they knew who did this to her, and that it was someone they were already looking for. This is absolutely impossible unless Adams and Persley planned on pinning both of these alleged crimes on [Kavanaugh] before anyone ever allegedly identified him[.]

There are two key problems with this argument. First, the quotation above comes from a transcript of an unsworn statement Baker made to public defender investigator Paula Hensinger ("Hensinger") in 2011. The district court declined to consider that transcript because, as this Court plainly directed in *Dole v. Elliott Travel & Tours, Inc.*, 942 F.3d 962 (6th Cir. 1991), "a court may not consider unsworn statements when ruling on a motion for summary judgment." 942 F.3d at 968-69. On appeal, Kavanaugh avers that Baker stated in her sworn deposition—two years after her conversation with Hensinger—that Baker had been truthful during the interview, but this assurance is not sufficient for the court to properly consider the content of the transcript. While it is true that there exists a statutory exception to the rule in *Dole*, that exception does not apply to Baker's interview with Hensinger.[4] The district court properly excluded the unsworn

---

[4]"[A] statutory exception to this rule exists which permits an unsworn declaration to substitute for a conventional affidavit if the statement contained in the declaration is made under penalty of perjury, certified as true and correct, dated, and signed." *Pollock v. Pollock*, 154 F.3d 601, 611 n.20 (6th Cir. 1998) (citing 28 U.S.C. § 1746). The statutory requirements to substitute an affidavit or otherwise properly sworn statement with an unsworn statement, however, are detailed and clear: the unsworn "declaration, certificate, verification, or statement" must be in writing,

statement, and without it, Kavanaugh's assertions that Adams and Persley made suggestive statements about him to Morgan and Baker are unsupported by the record.

Second, even taking the above statement into account, its contents are contradicted by Baker's deposition testimony, wherein she explains in more detail who told her what and when. Baker testified that a responding officer told her "it could be a possibility" that the suspect she had described at the scene was "somebody that they were looking for." Baker also stated that Persley told her the suspect was wanted for rape, but Baker clarified that Persley made that statement months after Baker had created the composite sketch and identified Kavanaugh in the resulting photographic line-up:

> Q:      And then you go on in your statement to say he was wanted for a few other rapes. I'm going to stop there; who told you that?
>
> A:      . . . Detective Persley told me that he was wanted, or that he had recently had just been arrested for attacking his daughter or something to that knowledge.
>
> Q:      **Did he tell you this before or after you picked his picture out?**
>
> A:      **Oh, this was six, seven months out.** . . . He was just telling me, I guess, calling me to keep me post[ed]—like, bring me up to date on the situation with the case[.]

Kavanaugh makes a similar argument regarding Morgan's testimony, and it fails for similar reasons. In his brief, Kavanaugh asserts that "Morgan testified that Adams had told her that [he] had raped a girl and gotten away with it, or something similar to that." The actual text of Morgan's statement is as follows:

> Q:      Did Ms. Adams ever tell you at any time that [Kavanaugh] had raped a girl in the past and gotten away with it or words like that?

---

signed, dated, and identified as true under penalty of perjury. 28 U.S.C. § 1746. Baker's deposition testimony in 2013 that she had been truthful during her interview with Hensinger does not meet these exacting requirements.

A:      Maybe something similar to that.

. . .

Q:      And what about your dad; did your dad ever tell you that your attacker had raped somebody in the past?
A:      I believe that it was more so that he'd been charged before. **I don't believe either of them have ever made a statement that he has done something.**

Kavanaugh's alleged evidence that the defendants improperly led Morgan or Baker to identify him does not actually support his claim that *Adams* and *Persley* made such statements or that they made such statements *prior* to the victims' own identification of the suspect.

c.

Kavanaugh also asserts that the only reason he was ever connected with the alleged crimes was that Adams purposefully did so.  That Adams apparently recognized Kavanaugh from the Baker composite is not, in itself, support for his claim of malicious prosecution.  This is because on its face, it suggests no impropriety: a detective saw a victim's composite sketch of the suspect and thought it resembled a suspect encountered in a prior investigation.  But Kavanaugh also argued before the district court that no photographic line-up had taken place before he was arrested; thus, he averred, Adams had lied about the victims' identification of Kavanaugh to swear out a warrant.  On appeal, this claim is jumbled; at any rate, Kavanaugh seeks to support it with the same evidence presented to—and rejected by—the district court.

To support his claim that Adams connected Kavanaugh to the assaults without the benefit of victim confirmation, Kavanaugh first presents his own deposition testimony.  Kavanaugh states that, at the first interview after his arrest, Adams said that "she did not use a lineup" and that "she had shown" the victims only "a single photo" of him.  However, Kavanaugh's testimony establishes only that he was identified from a single photo rather than a full photo

array. While this identification was far from ideal, we must view the use of such improper photographic evidence in light of the totality of the circumstances. *Compare Simmons v. United States*, 390 U.S. 377, 383 (1968) *and Milteer v. Baker*, 121 F.3d 708 at *4 (6th Cir. 1997) *with Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) *and Snyder v. United States*, 590 F. App'x 505, 512 (6th Cir. 2014). Here, the record clearly establishes that both victims repeatedly identified Kavanaugh as their assailant. Even taking Kavanaugh's testimony as true, he does not show that Adams' alleged conduct resulted in his arrest or prosecution *without probable cause*.

In the same vein, Kavanaugh presents an affidavit from the defense attorney who accompanied him to the interview, David Zorin ("Zorin"). Zorin states:

> During the interview, I questioned Detective Adams as to how she identified Pleas Kavanaugh as the suspect. She stated it was simply based on a single computer generated identification sketch. I specifically asked her "is that all you have" and she responded "yes, that's how we got him" or words to that effect. Detective Adams never mentioned anything about a "six pack" photo array or any other form of identification.

Again, Zorin's statement indicates that *Adams* identified Kavanaugh solely from the composite sketch, and that this was the sole basis for identifying him with the case. However, the district court notes that "Adams's statement simply doesn't address how *the victims* identified Kavanaugh as the perpetrator." Even drawing all inferences from this evidence in Kavanaugh's favor and assuming arguendo that "is that all you have?" followed by "yes" suggests that no line-up existed before Kavanaugh was arrested, this Court must still place that evidence in the context of the record and the legal claim at hand. That record includes Kavanaugh's own admission that Baker's composite sketch resembled him, as well as assertions from Morgan and Baker that they identified him from a photographic line-up. Zorin's statement is a classic example of *Anderson*'s "scintilla of evidence": even if the Court assumes

Kavanaugh's interpretation is correct, in context, Zorin's statement is not probative evidence "on which the jury could reasonably find for" Kavanaugh. *Anderson*, 477 U.S. at 252.

d.

Kavanaugh asserts that Adams mislead the grand jury when she testified regarding the results of the DNA tests conducted on blood found at the scene of Morgan's attack. Adams allegedly told the grand jury that the results of the DNA tests were unavailable. However, the actual lab report indicates that testing was completed in March 2010, before Adams testified to the grand jury in May 2010. When questioned on this point, Adams responded she had not received the results of the DNA tests prior to testifying. Kavanaugh insists that Adams had the results, though he presents no evidence that this was the case. Even assuming Adams had the results, Adams "has absolute immunity from any § 1983 claim based on [her grand jury] testimony." *Rehberg v. Paulk*, 132 S. Ct. 1497, 1506 (2012) ("[A] grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony. . . . [T]his rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution.") Moreover, the lab results showed only that the blood collected from the scene was Morgan's. Thus, even if Adams outright lied about not having the results, those results did nothing to further or hinder the case against Kavanaugh, suggesting that the district court was correct to consider debate over the lab report a non-material issue of fact.

2.

There is no dispute that Kavanaugh was deprived of his liberty for the prosecution of the attack against Morgan and that the Morgan case was resolved in his favor. *See Webb*, 789 F.3d

at 659. The parties disagree, however, regarding whether the prosecutor's decision to dismiss the charges against Kavanaugh regarding the attack on Baker constitutes resolving the legal proceedings in his favor for the purposes of his malicious prosecution claim. As Kavanaugh has failed to present sufficient evidence that the defendants lacked probable cause for his arrest and prosecution, we need not wade into this issue.

3.

The inquiry regarding whether Adams and Persley "made, influenced, or participated in the decision to prosecute" Kavanaugh is dependent on whether they knew or should have known that there was no probable cause to do so. *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015). Put another way, Kavanaugh must show that Adams and Persley "(1) stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." *Gregory*, 444 F.3d at 758. As discussed in the probable cause analysis *supra*, however, Kavanaugh has not presented evidence from which a jury could reasonably conclude that Adams and Persley deliberately or recklessly disregarded the truth in their investigation.

In all, Kavanaugh "fails to make a showing sufficient to establish the existence of an element essential to [his] case" regarding one or more key parts of his claim. *Celotex*, 477 U.S. at 322-23. The district court did not err in awarding the defendants summary judgment on this basis.

C.

Kavanaugh also claims that LFUCG and Bastin violated § 1983 by maintaining a policy or custom of inaction when faced with dishonest conduct on the part of its law enforcement officers (namely, Adams and Persley), and by failing to train them appropriately to avoid the

same. To state a claim for liability under § 1983, Kavanaugh must demonstrate 1) a deprivation of a constitutional right that was 2) caused by a person acting under color of law. *Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011); *see also West v. Atkins*, 487 U.S. 42, 48 (1988). Local governments may be considered "persons" for the purposes of such a claim. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). The only constitutional violation Kavanaugh has alleged is a violation of his Fourth Amendment rights arising out of his malicious prosecution. As Kavanaugh's claim for malicious prosecution was properly dismissed on summary judgment, he fails on his other § 1983 claims. *Robertson*, 753 F.3d at 622 ("There can be no liability under *Monell* without an underlying constitutional violation.").

III.

Based on the foregoing analysis, we **AFFIRM** the judgment of the district court.